UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


Charles Richard Stone,                          Civ. No.  11-951 (MWM/JSM)

              Plaintiff,                         **REPORT AND RECOMMENDATION**

       v.

Lucinda E. Jesson; Dennis L. Benson,
Thomas Lundquist, Greg Carlson,
Kevin Moser; David Prescott; Robert D. Liggett,

              Defendants.


       Plaintiff Charles Richard Stone commenced this action seeking relief under 42

U.S.C. §1983.[1]   See Complaint, ¶ 16 [Docket No. 1].   Plaintiff has claimed that

---

[1]     Plaintiff commenced this suit on April 15, 2011.  The District Court stayed this case on February 6, 2012, in light of a pending motion for class certification filed in Karsjens et. al. v. Minnesota Dep't of Human Servs., et. al., Civ. No. 11-3659 (DWF/JJK) Order [Docket No. 28].  The stay order was amended on October 27, 2014, to stay all current and future civil rights cases brought by individuals or group of individuals civilly committed to the Minnesota Sex Offenders' Program ("MSOP") that were sufficiently related to the Karsjens litigation.  Second Amended Stay Order [Docket No. 32].   On June 17, 2015, Judge Donovan Frank ruled in favor of the Karsjens plaintiffs on Counts I and II of their Third Amended Complaint, finding that the MSOP and its statutory scheme violated the United States Constitution.  Karsjens, Civ. No. 11-3659 (DWF/JJK) [Docket No. 966].  The Karsjens litigation remained on-going and the instant case, along with many others, remained stayed "pending the litigation in Karsjens, or until further order of the Court stating otherwise."  Third Amended Stay Order, p. 23 [Docket No. 33].   On October 29, 2015, Judge Frank issued the First Interim Relief Order in Karsjens, requiring defendants to promptly conduct independent risk and phase placement reevaluation of all current MSOP patients.  Karsjens, Civ. No. 11-3659 (DWF/JJK) [Docket No. 1035].   Defendants have appealed both of Judge Frank's orders to the Eighth Circuit Court of Appeals.  [Docket No. 1036].

       On April 14, 2016, Chief Judge John Tunheim lifted the stay in the instant case, determining that notwithstanding the fact that the Karsjens defendants have appealed Judge Frank's orders:

defendants have violated his Constitutional rights by either abandoning or misapplying the MSOP's 2007 Media Policy.  The matter is now before this Court on defendants' Motion to Dismiss, which defendants filed in lieu of answering the Complaint.  [Docket No. 9].

Following defendants' motion to dismiss, plaintiff moved for a permanent injunction barring defendants from tampering with his mail, from retaliating against him for his legal action against defendants and from inflicting mental or emotional injuries upon him.  [Docket No. 18].  Plaintiff has also moved to dismiss defendants' motion to dismiss [Docket No. 26].

These motions were referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and Local Rule 72.1(c).

---

it was appropriate to lift the stay in the instant case, as well as some others because the claims in these cases were not integral to Judge Donovan W. Frank's liability and relief orders in Karsjens.  As a result, it is unlikely that the claims in these cases will be affected by the Eighth Circuit's ultimate ruling in the Karsjens claims on appeal.  Further, because it is unclear at this juncture whether or when a Phase II trial in Karsjens might occur, any similarity between the above-entitled cases and Karsjens and the possibility of inconsistent rulings is outweighed by the prejudice to the Plaintiffs in the above-entitled matters of continuing to stay these cases pending subsequent litigation in Karsjens.

Order Lifting Stay, p. 6 [Docket No. 35].  Neither party has indicated to this Court that the issues raised in plaintiff's five-year-old Complaint are moot.

## I.    BACKGROUND

Plaintiff is a civilly committed sex offender,[2] who is housed at Moose Lake, Minnesota.  Complaint, ¶ 7.  Plaintiff is proceeding pro se and has in forma pauperis status.  [Docket No. 5].  Defendant Lucinda Jesson was the Commissioner of the Minnesota Department of Human Services at the time the Complaint was filed[3] and pursuant to Minn. Stat. § 246B.02, was responsible for establishing and maintaining the MSOP.  Complaint, ¶ 8.  Defendant Dennis Benson was the executive director of the MSOP at the time the Complaint was filed.[4]  Id., ¶ 9.  Defendant Thomas Lundquist is the Clinical Director of the MSOP.  Id., ¶ 10.  Defendants Greg Carlson and Kevin Moser are the Director and Assistant Director, respectively, of the MSOP.  Id., ¶¶ 11, 12.  Defendant David Prescott is the former Clinical Director of the MSOP.[5]  Id., ¶ 13. Defendant Robert Liggett is the Media Review Team Supervisor of the MSOP.  Id., ¶ 14.  Plaintiff sued these defendants in their individual and official capacities.

As a result of a settlement reached in Kruger v. Goodno, Civ. No. 05-2078 (JRT/FLN) (D. Minn.), the MSOP's previous media policy, created to comply with Minn.

---

[2]    Plaintiff was diagnosed as a pedophile and admitted molesting between 30 and 200 young girls.  Plaintiff unsuccessfully challenged his commitment as a psychopathic personality in 1985.  See In re Stone, 376 N.W.2d 511 (Minn. Ct. App. 1985).  In re Stone reviews plaintiff's offenses and his commitment.

[3]    Emily Johnson Piper was appointed Commissioner of the Department of Human Services on December 7, 2015.

[4]    Benson retired in 2012, during the time this matter was stayed. http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&d DocName=dhs16_169552&RevisionSelectionMethod=LatestReleased

[5]    Prescott was a clinical director of the MSOP until June 23, 2010.  Complaint, ¶ 34; Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs'. Mem."), p. 3 [Docket No. 11].

Stat. § 246B.04, was superseded by the MSOP's 2007 Media Policy ("MP").  Complaint,

¶¶ 27-30; Affidavit of Exhibits ("Stone Aff."), Ex. 1 (2007 Media Policy) [Docket No. 2-1]).

Minn. Stat. § 246B.04, subd. 2, provides:

> **Ban on obscene material or pornographic work.** The Commissioner shall prohibit persons civilly committed as sexual psychopathic personalities or sexually dangerous persons ... from having or receiving material that is obscene as defined under section 617.241, subdivision 1[6] material that depicts sexual conduct as defined under section 617.241, subdivision 1,[7] or pornographic work as defined

---

[6]     The version of Minn. Stat. § 617.241, subd. 1(a) governing at the time of the filing of the Complaint provided:

> "Obscene" means that the work, taken as a whole, appeals to the prurient interest in sex and depicts or describes in a patently offensive manner sexual conduct and which, taken as a whole, does not have serious literary, artistic, political, or scientific value. In order to determine that a work is obscene, the trier of fact must find:
>
> > (i) that the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest in sex;
> >
> > (ii) that the work depicts sexual conduct specifically defined by clause (b) in a patently offensive manner; and
> >
> > (iii) that the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

[7]     The version of Minn. Stat. § 617.241, subd. 1(b) governing at the time of the filing of the Complaint provided:

> "Sexual conduct" means any of the following:
>
> > (i) An act of sexual intercourse, normal or perverted, actual or simulated, including genital-genital, anal-genital, or oral-genital intercourse, whether between human beings or between a human being and an animal.

under section 617.246, subdivision 1,[8] while receiving services in any secure treatment facilities operated by the

---

(ii) Sadomasochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a sexually revealing costume or the condition of being fettered, bound, or otherwise physically restricted on the part of one so clothed or who is nude.

(iii) Masturbation, excretory functions, or lewd exhibitions of the genitals including any explicit, close-up representation of a human genital organ.

(iv) Physical contact or simulated physical contact with the clothed or unclothed pubic areas or buttocks of a human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.

[8]   Minn. Stat. § 617.246, subd. 1(f) states:

"Pornographic work" means:

(1) an original or reproduction of a picture, film, photograph, negative, slide, videotape, videodisc, or drawing of a sexual performance involving a minor; or

(2) any visual depiction, including any photograph, film, video, picture, drawing, negative, slide, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means that:

(i) uses a minor to depict actual or simulated sexual conduct;

(ii) has been created, adapted, or modified to appear that an identifiable minor is engaging in sexual conduct; or

(iii) is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexual conduct.

> Minnesota sex offender program or any other facilities operated by the commissioner.

The purpose of the MP is to:

> provide a therapeutic living environment for patients in the [MSOP] that enhances their rehabilitation, to provide a safe and secure environment for all persons in MSOP facilities, and to comply with the provisions of the Minnesota Statutes section 246B.04, subdivision 2, by restricting patients from possessing obscene, pornographic, or other prohibited materials in a way that is consistent with the constitutional rights of civilly-committed patients.

MP, p. 1.  Further, the MP states that:

> [c]ivilly committed patients retain their First Amendment rights, unless those rights are restricted for important and specified treatment or safety reasons.
>
> ***
>
> There is a reasonable likelihood that some sexually explicit materials, which are otherwise legal, can increase the likelihood of assaultive or harassing behavior among committed patients.  These materials may also hinder a patient's rehabilitation.  Designated MSOP treatment staff members will review materials to ensure that they do not contain prohibited content.

Id.[9]

---

These statutes were slightly amended and renumbered in 2013 during the pendency of this lawsuit.

[9]   A more complete description of the history of the MP is found in Ivey v. Mooney, Civ. No. 05-2666 (JRT/FLN), 2008 WL 4527792 at *1 (D. Minn. Sept. 30, 2008).  In brief, in 2004, the Minnesota Legislature enacted Minn. Stat. § 246B.04.  That statute, entitled "Ban on Obscene Material or Pornographic Work," restricted the access to certain types of media by persons civilly committed as psychopathic personalities.  Id. In 2004, MSOP created a procedure for handling media within its facilities that was consistent with Minn. Stat. § 246B.04.  Id.  That MSOP policy was the subject of litigation by MSOP patient Charles Kruger in Kruger v. Goodno.  Id.  Kruger settled his claims and as part of the settlement, the 2004 MSOP policy was replaced by the MP now at issue.  Id.  The Kruger settlement required MSOP staff to apply the MP rather

The MP classified media material into one of three categories: prohibited, counter-therapeutic, and permitted.   "Prohibited materials" may not be possessed by any patient and are defined under section "A" of the MP as:

1.     Obscene materials, as defined in Minnesota Statutes section 617.241.

2.     Illegal materials, such as those containing child pornography as defined in Minnesota Statutes section 617.246.

3.     Any pictures, including pictures in reading materials, or videos of full or partially nude minor children with clearly visible genitals.

4.     Any pictures, including pictures in reading materials, or videos of the unclothed or clothed figure of a minor child posing in a sexually suggestive posture or sexual manner.

5.     Movies rated "NC-17" or "X."

6.     Video games with an Entertainment Software Rating Board ("ESRB") [10] rating of "AO."

7.     Any pictures, including pictures in reading materials, or videos showing close-up depictions of

a.     sexual intercourse, including any type of vaginal, oral or anal penetration;

b.     human genitalia in a lewd and explicit fashion;

c.     masturbation;

d.     excretory functions;

---

than Minn. Stat. § 246.04 in determining what media materials are permitted or prohibited.  Id. at *3.

[10]     An "ESRB" rating of AO (adults only) includes titles should only be played by persons 18 years or older.  Content may include prolonged scenes of intense violence, and/or graphic sexual content, nudity or gambling with real currency. http://www.esrb.org/ratings/ratings_guide.aspx.

e.      sexual relations between a human being and an animal; or

f.      sadomasochistic abuse.

8.      Pictures, videos or reading materials that, taken as a whole, promote sexual violence child molestation, or incest or that, taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines such as Playboy, Penthouse and Hustler.

9.      Pictures of the patient's victims.

10.     Otherwise permitted materials of the type that the patient has misused in the past, providing that the restriction is proportionate to the misuse.

MP, p. 2.

"Counter-therapeutic" materials are defined under section B of the MP as:

1.      Materials that have been determined for articulated reasons, by the Media Review Team, under the supervision of a competent mental health professional, to reinforce a problem area related to the sexual offending cycle of the patient who possesses or seeks to possess the materials; or

2.      Materials depicting nudity, sexual contact, sadomasochistic abuse, masturbation or execratory functions that are not prohibited under Section A, above and have been determined for articulated reasons, by a competent mental health professional, to be counter-therapeutic either to

a.      the patient who possesses the material, or,
b.      a large number of patients in the Program.

Id., p. 3.  Patients may possess counter-therapeutic material, but that decision is noted in the patient's records.  Id.  "Permitted materials" are those not classified as prohibited or counter-therapeutic.  Id.

Relevant to the issues presented by plaintiff's Complaint, the procedure for classifying media materials and providing access to the materials by MSOP patients is described in section E of the MP:

> 1.      Motion picture movies rated "G," "PG," or "PG-13" are classified as permitted materials under this procedure without having to be reviewed individually.   "R" rated and unrated movies are not prohibited or counter-therapeutic as a category, but only if so classified by the Media Review team.
>
> ***
>
> 3.      To assist patients in knowing what "R"-rated, "M" and "RP" and unrated videos are acceptable, MSOP will maintain lists of permitted, counter-therapeutic…and prohibited "R"-rated, "M," "RP" and unrated videos.   These lists shall be updated whenever a classification of a video has been made, and at least quarterly during the first year of implementation and biannually thereafter.
>
> 4.      Before possessing a video that is not rated "G," "PG," "PG-13," . . . a patient must obtain approval from the Media Review Team.   If necessary for a complete review, the patient will be advised that the video will need to be viewed by the Media Review Team.
>
> ***
>
> 6.      Any determination under this section that material is prohibited or counter-therapeutic shall be made in writing, with notice to the patient, and with specific reasons stated.

MP, pp. 3-4.

Patients may appeal from the decision of the Media Review Team ("MRT") pursuant to section E(4), above. Id., p. 4.  The MP provides:

> If a patient disagrees with a decision of the Media Review Team, he may appeal the decision by completing a grievance request.   No confiscated materials will be destroyed, or consequences imposed, apart from seizing a computer, media source and/or equipment, pending outcome of the grievance process.

Id., p. 7.

Plaintiff alleged that when defendant Dennis Benson became the Executive Director of the MSOP in 2007, he enacted "new punitive and restrictive policies that appear to have a cumulative effect in removing our constitutional rights."[11]  Complaint, ¶ 32.  According to plaintiff, Benson had been "moving away" from implementing the MP and was re-implementing Minn. Stat. § 246B.04 in violation of plaintiff's constitutional rights and in violation of the Kruger settlement.  Id., ¶¶ 35, 56.

Specifically, when Benson became Executive Director of the MSOP, movies that had been previously classified as "Permitted" or "Counter-therapeutic" were reclassified as "Prohibited."  Complaint, ¶ 38.  Plaintiff attached a list of these movies to his Complaint.  Stone Aff., Ex. 2.

The Complaint alleged that the MRT was reviewing media in an unconstitutional manner by failing to follow the MP.  Id.,¶ 39.  Plaintiff also complained that the MSOP mailroom staff impermissibly redirected media to the MRT for review, when it had already been reviewed once.  Id.  According to plaintiff, the MP does not authorize the re-screening of media.  Id., ¶¶ 39-41.

Plaintiff claimed that the MRT has been classifying some movies with "G," "PG," and "PG-13" ratings as "Prohibited," in violation of the MP, which provides that "[m]otion picture movies rated 'G,' 'PG' or 'PG-13' are classified as permitted materials under this procedure without having to be reviewed individually."  Id., ¶ 42, n.8.  The MRT marks these movies on the media lists as being "unrated," "not rated," or the rating column is

---

[11]   The Complaint listed some of the new policies that plaintiff considered punitive and stated that Benson implemented a total of 212 such policies.  Complaint, ¶ 32. Plaintiff did not challenge these policies and therefore, the Court will not address them.

left blank.  Id., ¶ 42.  Plaintiff alleged that patients have been forced to send this misclassified media materials out of the facility.  Id.

Similarly, plaintiff alleged that the MRT has been routinely reviewing "unrated" and "R" rated movies and classifying them as "Prohibited, which had the MRT been following the MP, these movies would have been deemed to be "Permitted" or "Counter-therapeutic."  Id., ¶¶ 43, 44.  For example, the movie "American Girl: Chrissa Stands Strong" was initially unrated and then later deemed "Prohibited" although it did not fall within the definition of prohibited media under the MP.  Id., ¶ 43.  The movie was later re-classified as "Counter-therapeutic" by the MRT because for a period of four seconds it depicted a nude female baby showing the chest area and part of the buttocks, and a few minutes of male and female children, ages 9 to 11, in swimsuits, and the boys without shirts.  Id.; Stone Aff., Ex. 7, p. 10[12] (MSOP staff reviewer comments).

Another example described by plaintiff was the movie "Kickass 2010," which showed a brief scene of nudity, obscured and not clearly visible through shower steam.  Id., ¶ 44.  This movie had been rated "R" and according to plaintiff, did not contain "fully or partially nude children with clearly visible genitals" or promote "child pornography when taken as a whole."  Id.

Plaintiff alleged that there has been no consistency in the application of the MP, as evidenced by the fact that previously permitted movies were now prohibited.  Id., ¶ 45.

---

[12]     The Court will refer throughout this Report and Recommendation to the page numbers assigned to plaintiff's exhibits through the CM/EFC system, as plaintiff did not number the pages.

Plaintiff further alleged that the MRT has deemed certain print materials prohibited, such as "Art and Educational Materials," "Interview," "Details," "Professional Photographer," and "Movies Unlimited catalogs 2009, 2010, 2011."[13] Id., ¶¶ 46, 47; Stone Aff., Ex. 3. Plaintiff claimed that these materials are not the same as the print materials referenced in the MP as typical of what a patient could expect to be classified as prohibited,[14] or previously these materials had been marked as "NCF"[15] (e.g. Movies Unlimited 2011 catalog). Complaint, ¶ 47; Stone Aff., Ex. 4.

Plaintiff claimed that "even on appeal," Clinical Director Lundquist failed to follow the MP, and had failed to do so since June, 2010. Complaint, ¶ 48.

On March 8, 2011, plaintiff wrote to Robert Liggett, the MRT supervisor, to express his concerns that by classifying films as "Prohibited" that were formerly classified as "Permitted," the MRT was acting against the MP. Id., ¶ 50; Stone Aff., Ex. 5 (Client Request Form dated March 8, 2011 and Response). The "MRT Team" responded that "[it] has the option to appeal any movie on the permitted list and have the movie reviewed by the Clinical Director. If the movie is deemed Prohibited by the clinical team, the movie is then moved to the prohibited list." Stone Aff., Ex. 5. The

---

[13] Only specific issues of "Interview" and "Details" and "Professional Photographer" have been deemed prohibited. Stone Aff., Ex. 3, p. 44 [Docket No. 4-1].

[14] According to the MP: the following are examples of prohibited print media:

[p]ictures, videos or reading materials that, taken as a whole, promote sexual violence child molestation, or incest or that, taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines such as Playboy, Penthouse and Hustler.

MP, p. 2.

[15] "NCF" stands for "No Contraband Found." Complaint, ¶ 47.

person or persons responding to plaintiff's statement were not identified. Id.  On further inquiry by plaintiff, Liggett responded that he endorsed the answer given as correct. Stone Aff., Ex. 6.

On March 9, 2011, plaintiff again wrote to Liggett, demanding to know "what is the purpose of [the court order in the Kruger litigation] if MSOP can override the Court's decision?"  Stone Aff., Ex. 7.  Liggett responded:

> A decision of NCF (no contraband found) on any media item is not a guarantee that it contains no violations or counter-therapeutic material.  Reports from clients or staff may point out violations missed in the initial review.  As always, the final say on any media item will be handled by the Clinical Director or his designated clinical team.

Id.; see also Complaint, ¶¶ 50, 51.

On information and belief, plaintiff claimed that the MRT has been routinely "re-reviewing movies after having gone through the original process of further review by the Clinical Director or his designated clinical team, because the MSOP staff believes we (patients/clients) should not be allowed to have such media, and asked the MRT to overrule previously approved items as designated through the appeal processes, that are designed to protect our First and fourteenth Amendment Rights guaranteed under the United States Constitution."  Complaint, ¶ 52.

The Complaint alleged that on March 8, 2011, plaintiff spoke with Kevin Moser, the Assistant Director of the MSOP, about current MRT policies, and at which time Moser indicated that the MSOP was changing the MP to be in conformance with Minn. Stat. § 246B.04, subd. 2, as written.  Complaint. ¶ 53.  When plaintiff reminded Moser that the MSOP is required to follow the MP, Moser responded:  "Isn't Kruger dead? That policy no longer applies."  Id.  Moser went on to tell plaintiff that he "wanted to work

together on the issue" and asked plaintiff to submit the list of movies that had been moved from the "Permitted" to the "Prohibited" list. Id. On March 10, 2011, plaintiff sent the list to Moser and asked that the movies be re-classified as "Permitted" or "Counter-therapeutic." Complaint, ¶ 54; Stone Aff., Ex. 2, p. 7. Moser responded on March 23, 2011, that he "had been informed that a movie can be moved from one list to another list by the decision of the Clinical Director. Thank you." Id., p. 6.

Plaintiff alleged that defendants' determinations regarding the media, "subsequent demanding plaintiff to send out [at] Plaintiff's expense, plaintiff's media (DVD's [sic], books, magazines, letters etc….),[16] and the "reapplication" of Minn. Stat. § 246B.04, substantially interfered with his freedom of thought and expression. Complaint, ¶¶ 55, 56. The Complaint also alleged that defendants acted "arbitrarily and capriciously" by stating that the MP is no longer in effect because "Kruger is dead" and that defendants have violated plaintiff's First and Fourteenth Amendment rights. Complaint, ¶¶ 57-61.

While the allegations in the Complaint relate primarily to the MP, plaintiff also alleged that MSOP employees confiscated materials in 2006 that would show "the plight of [Plaintiff's] current confinement within MSOP" and have not returned them. Complaint, ¶ 23. As a result, plaintiff alleged that "Defendant's [sic] personal property policies and practices have substantially interfered with the Plaintiff's right to petition the government for redress of his grievances and right of access to the courts to challenge confinement and seek redress of his constitutional rights." Id., ¶ 57.

---

[16]     There is no other reference in the Complaint regarding items plaintiff was required to send out of the facility or at what cost.

Count One of the Complaint alleged that Minn. Stat. § 246B.04, subd. 2, on its face and as applied to plaintiff, was overly broad and vague, chilled his protected speech, and gave defendants arbitrary and capricious discretion to prohibit protected speech in violation of the First and Fourteenth Amendments. Id., ¶¶ 63, 64.

Count Two alleged that the "lack of application" of the MP "on its face and as applied to Plaintiffs [sic]" chilled plaintiff's protected speech in violation of the First and Fourteenth Amendments. Id., ¶¶ 66, 67.

As relief, plaintiff sought the following: (1) preliminary and permanent injunctive relief enjoining defendants from enforcing Minn. Stat. § 246B.04, subd. 2; (2) a declaratory judgment that defendants violated plaintiff's First and Fourteenth Amendment rights; (3) a declaratory judgment that Minn. Stat. §246B.04, subd. 2 is unconstitutional and void; (4) a declaration that defendants violated plaintiff's First and Fourteenth Amendment rights by lack of proper application of the MP; (5) the Court devise a new media policy that protects MSOP clients/patients' right to free speech and includes implementation and monitoring procedures, and sanctions for non-compliance; (6) an order requiring Benson to issue a written apology to the clients/patients of the MSOP for his "blatant disregard of each of our Constitutional Rights;" and (7) punitive damages awarded to the clients/patients of the MSOP, which would not be subject to attachment. Complaint, Prayer for Relief.

Defendants moved to dismiss plaintiff's Complaint with prejudice pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6). [Docket Nos. 9, 11].

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1) Motion

A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments.  See Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993); see also Osborn v. United States., 918 F.2d 724, 729 n.6 (8th Cir. 1990).   In a facial challenge to jurisdiction, the court restricts its review to the pleadings and affords the non-moving party the same protections that it would receive under a Rule 12(b)(6) motion to dismiss.  See Osborn, 918 F.2d at 729, n.6.  The court presumes that all of the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction.  See Titus, 4 F.3d at 593 (citing Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 731-32 (11th Cir. 1982)); Osborn, 918 F.2d at 729 n 6.

In a factual challenge to jurisdiction, the court may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6). See Titus, 4 F.3d 590 at 593; Osborn, 918 F.2d at 729 n. 6.  "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."  Osborn, 918 F.2d at 730 (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F. 2d 884, 891 (3rd Cir. 1977)).

Defendants have challenged plaintiff's claim for money damages against the defendants on the basis of Eleventh Amendment immunity and have claimed that the

16

Court lacks subject matter jurisdiction to consider those claims.  Defs'. Mem., pp. 6-34. This Court construed this to be a facial challenge to subject matter jurisdiction.

### B.    Rule 12(b)(2),(5) Motion

Pursuant to Fed. R. Civ. P. 12(b)(5), a party may move to dismiss a complaint for insufficient service of process.  The standard of review for a 12(b)(5) motion to dismiss is the same as that used for a 12(b)(2) motion to dismiss for lack of personal jurisdiction. Kammona v. Onteco Corp., 587 Fed. Appx. 575, 577-78 (11th Cir. 2014) (cert. denied, 135 S. Ct. 2316 (2015)).   Therefore, to survive a motion to dismiss for insufficient service, "a plaintiff must plead sufficient facts to support a reasonable inference that the defendant" has been properly served.  Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015) (quotation omitted).  The plaintiff bears the burden of proof on the issue of service.  Id.

### C.    Rule 12(b)(6) Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

To satisfy the requirements of Twombly and Iqbal, "a complaint need not contain 'detailed factual allegations,' . . . ."  United States ex rel. Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012) (quoting Twombly, 550 U.S. at 555).  However, "'[t]he facts alleged in the complaint must be enough to raise a right to relief above the speculative level.'"  Mickelson v. Cty. of Ramsey, --- F.3d ---, 2016 WL 2342925, at *3 (8th Cir. May 4, 2016) (quoting Clemons v. Crawford, 585 F.3d 1119,

1124 (8th Cir. 2009)).  "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Kelly v. City of Omaha, Neb., 813 F.3d 1070, 1075 (8th Cir. 2016) (citation omitted).  "[C]onclusory statements' and 'naked assertion[s] devoid of further factual enhancement'" are insufficient to satisfy this standard.  Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768 (8th Cir. 2012) (quoting Iqbal, 556 U.S. at 678).

In deciding a motion to dismiss, a court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint.  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").  Plaintiff attached an affidavit and numerous exhibits to his Complaint and the Court has considered all of these materials.

Pro se complaints, "however inartfully pleaded" are held to "less stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972).  "'[I]f the court can reasonably read the pleadings to state a valid claim on which the [plaintiff] could prevail, it should do so despite the [plaintiff's] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.'"  Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999) (quoting Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir.1991)); Stone v. Harry, 364 F.3d 912, 915 (8th Cir. 2004) ("w]hen we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety,

then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework.").

At the same time, the court's liberal construction does not extend to allowing defective and insufficiently pled claims to proceed.  Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir.1985). ("[A]lthough it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions."); Kaylor v. Fields, 661 F.2d 1177, 1183 (8th Cir. 1981) ("[P]leadings * * *brought pro se [ ] are to be liberally construed. * * * But a well-pleaded complaint must contain something more than mere conclusory statements that are unsupported by specific facts." (citations omitted)).  A pro se complaint "must allege sufficient facts to support the claims advanced * * * we will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts that have not been pleaded." Stone, 364 F.3d at 914 (citations omitted).  Neither may the courts, in granting the deference owed to pro se parties, "assume the role of advocate for the pro se litigant." Barnett, 174 F.3d 1133.

## III.   DISCUSSION

### A.   Failure to Serve Jesson and Prescott.

Defendants contended that plaintiff failed to properly served defendants Jesson and Prescott and have moved for dismissal of the Complaint against them pursuant to Rules 12(b)(2) and (5).  Defs'. Mem., pp. 6-7; Defendants' Reply Memorandum ("Defs'. Reply"), pp. 1-2 [Docket No. 23].  Because plaintiff sued Jesson and Prescott in their individual capacities, he was required to serve them pursuant to Minn. R. Civ. P. 4.03

(personal service) or 4.05 (service by mail with accompanying acknowledgment).  Defs'. Mem., p. 6.[17]

Plaintiff did not dispute that he failed to perfect personal service on Jesson and Prescott.  Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Complaint ("Pl.'s Resp."), pp. 1-2, 6[18] [Docket No. 22].  Nonetheless, plaintiff asserted that he filled out the forms necessary for service of the summons and complaint in good faith.  Id., p. 6.

A plaintiff must timely serve a copy of the summons and complaint pursuant to Rule 4(m) although the court may expand the allowable time for good cause shown. Fed. R. Civ. P. 4(m).  A court may dismiss a matter for failure to timely serve the summons and complaint within the 120-day time period.[19]  Marshall v. Warwick, 155 F.3d 1027, 1030 (8th Cir. 1998) (citing Edwards v. Edwards, 754 F.2d 298, 299 (8th Cir. 1985) (per curium)).  A plaintiff's pro se status does not excuse him from the requirements of proper service.  Selmer v. Klang, 603 F. Supp. 2d 1211, 1226 (D. Minn. 2009) (a pro se plaintiff is not excused from the procedural requirements of service, good faith efforts to effect service do not suffice).  Further, actual notice of the lawsuit by

---

[17]    Federal Rule of Civil Procedure 4(e) provides that an individual may be served within a judicial district of the United States by following state service laws or delivering a copy of the summons and complaint to them personally; leaving a copy at the individuals usual place of abode with someone of suitable age and discretion; or delivering a copy of the summons and complaint to the individual's authorized agent.

[18]    The Court will refer to the page numbers assigned to plaintiff's response through the CM/EFC system, as plaintiff did not number the pages of his brief.

[19]    Rule 4(m) was amended during the pendency of the stay in this case to reduce the time to serve a summons and complaint from 120 days to 90 days.

the defendants does not relieve plaintiff from his duty to effect proper service. Id. The court lacks jurisdiction over a party not properly served. Id.

Notwithstanding the foregoing principles, this Court concludes that dismissal of plaintiff's claims against Jesson and Prescott on the basis of lack of proper personal service is not warranted for the following reasons. First, the remedy for defective service is generally dismissal without prejudice. See Ouzts v. Cummins, 825 F.2d 1276, 1278 (8th Cir.1987) (affirming dismissal without prejudice for failure to serve process on defendants). Because the Court has concluded that the claims against Jesson and Prescott fail as a matter of law, no purpose would be served to have plaintiff re-plead his claims against these defendants, only to later recommend dismissal.

Second, defendants' counsel's notice of appearance was made on behalf of all defendants. Notice of Appearance [Docket No. 8].

Third, a litigant proceeding in forma pauperis has a right to rely on service by federal marshals. Wright v. First Student, Inc., 710 F.3d 782, 783 (8th Cir. 2013) ("Because [plaintiff] was proceeding IFP, he was entitled to rely on service by the USMS."). Plaintiff, who has in forma pauperis status, stated that he filled the service forms out in good faith and gave them to the U.S. Marshal for service.

Under the facts and circumstances presented here, the Court will not recommend dismissal plaintiff's claims against Jesson and Prescott on the basis of lack of proper service.

**B.   Claims Against the State and Individual Defendants under 42 U.S.C. § 1983**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

Pursuant to § 1983, an individual may "vindicate rights conferred by the Constitution or laws of the United States." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000). Section 1983 is not "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144, n.3 (1979). To successfully plead a §1983 cause of action, a plaintiff must allege a set of historical facts, which, if proven true, would demonstrate that the named defendants violated the plaintiff's federal constitutional rights while acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). Further, "[l]iability under §1983 requires a causal link to, and direct responsibility for, the deprivation of rights" protected by the Constitution. Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990); Speed v. Ramsey County, 954 F.Supp. 1392, 1397 (D. Minn.1997) (same).

### 1.   Eleventh Amendment Immunity

Defendants contended that claims against them for actions undertaken in their official capacities had to be dismissed on the basis of Eleventh Amendment immunity. Defs.' Mem., pp. 7-8. Plaintiff responded that defendants were merely invoking Eleventh Amendment immunity to "avoid the consequences of their intentional actions"

and cited Minnesota statutes regarding limitations for liability in connection with speech aimed at government and Minnesota's punitive damages statute.  Pl.'s Resp., p. 7.

The Eleventh Amendment states that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State."   Under the Eleventh Amendment, federal courts lack subject matter jurisdiction over a claim against a state for damages when that state has not consented to the suit.  See Kimmel v. Florida Bd. of Regents, 528 U.S. 62, 72 (2000); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 64-65 (1996).  When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction.  Seminole Tribe, 517 U.S. at 64-65.

Eleventh Amendment immunity also extends to state officials, since "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citations omitted); see also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (Eleventh Amendment immunity extends to state officials when the "state is the real, substantial party in interest.") (internal quotation omitted); Treleven v. University of Minn., 73 F.3d 816, 818 (8th Cir. 1996) (official capacity lawsuits are "essentially 'for the recovery of money from the state.'") (quoting Ford Motor Co. v. Department of the Treasury, 323 U.S. 459, 464 (1945)).

The Eleventh Amendment does not bar suits against state officials acting in their official capacities for prospective, injunctive relief "to prevent future violations of federal law."  Treleven, 73 F.3d at 819 (citing Fond du Lac Band of Chippewa Indians v.

Carlson, 68 F.3d 253, 255 (8th Cir. 1995)).   Further, "state officials are 'persons' under §1983 when sued for injunctive relief because such actions are not treated as actions against the State."   Id. (internal citations and quotation marks omitted) (emphasis added).   Nor does the Eleventh Amendment bar suits against State employees acting in their individual capacities.[20]   Id. (citing Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997)).

Here, plaintiff has sued the defendants in their official and individual capacities, for both punitive damages and for injunctive relief.   Complaint, ¶¶ 64, 67; Prayer for Relief, ¶ G.   However, none of the defendants has consented to suit.   Therefore, the Court lacks jurisdiction over any claims other than those seeking prospective injunctive relief.   On this basis, the Court recommends dismissal of all damage claims against all defendants in their official capacity.

## 2.    Official Capacity Claims for Injunctive Relief

Having concluded that the Eleventh Amendment precludes a claim for damages against state officials in their official capacities, does not mean that plaintiff can proceed against all defendants for injunctive relief.   Section 1983 claims for prospective injunctive relief can be brought against state employees in their official capacities so long as the claims meet the requirements set forth in Ex parte Young. [21]   Serna v.

---

[20]    Defendants admit that the Eleventh Amendment does not bar claims for prospective relief against State employees acting in their official capacities or claims for damages against State employees acting in their individual capacities.   Defs'. Mem., p. 7, n.1.

[21]    Defendants did not raise the Ex parte Young exception to Eleventh Amendment immunity in their motion to dismiss.   Nonetheless, whether defendants are entitled to Eleventh Amendment immunity implicates the court's subject matter jurisdiction and may be raised sua sponte.   See Pennhurst, 465 U.S. at 121, 104 S.Ct. at 919 ("A

Goodno, 567 F.3d 944, 952 (8th Cir. 2009) ("[I]n accordance with Ex Parte Young, 209

U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Eleventh Amendment bars damages

claims against the states, but generally does not bar claims for prospective injunctive

relief against public officials in their official capacities."). "In Ex parte Young, 209 U.S. at

157, 28 S.Ct. 441, the Supreme Court held that the Eleventh Amendment does not bar

a suit against a state official to enjoin enforcement of an allegedly unconstitutional

statute, provided that 'such officer [has] some connection with the enforcement of the

act.'" Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon,

428 F.3d 1139, 1145 (8th Cir. 2005) (alteration in original) (citation omitted) (emphasis

added).

As the Supreme Court explained:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of that act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

Ex parte Young, 209 U.S. at 157.

Accordingly, "[t]he Ex parte Young exception only applies against officials 'who

threaten and are about to commence proceedings, either of a civil or criminal nature, to

enforce against parties affected an unconstitutional act, violating the Federal

Constitution.'" 281 Care Comm. v. Arneson, 766 F.3d 774, 797 (8th Cir. 2014) (citation

---

federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."); West Virginia Oil & Gas Ass'n v. Wooten, 631 F. Supp. 2d 788, 796-97 (S.D. West Va. 2008) (addressing sua sponte the application of Ex parte Young); Atlantic Healthcare Benefits Trust v. Googins, 2 F.3d 1, 4 (2d Cir. 1993) (raising the Eleventh Amendment sua sponte and determining sua sponte that the court had jurisdiction pursuant to Ex parte Young).

omitted); <u>Harris v. Hammon</u>, 914 F. Supp. 2d 1026, 1035 (D. Minn. 2012) (same); <u>see also id.</u> ("Absent a real likelihood that the state official will employ his supervisory powers against plaintiffs' interests, the Eleventh Amendment bars federal court jurisdiction.") (citing <u>Long v. Van de Kamp</u>, 961 F.2d 151, 152 (9th Cir.1992) (per curiam)).

> <u>Young</u> has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation.

<u>Papasan v. Allain</u>, 478 U.S. 265, 277-78 (1986); <u>see also</u> <u>Randolph v. Rodgers</u>, 253 F.3d 342, 348 (8th Cir. 2001) ("<u>Ex parte Young</u> simply permits an injunction against a state official in his official capacity to stop an ongoing violation of federal law.") (citation omitted).

Applying these principles here, and for the reasons set forth in the next section addressing individual capacity, the Court finds that plaintiff's official capacity claims for prospective injunctive relief against Jesson, Prescott, Carlson, Benson and Lundquist fail. There were no facts alleged in the Complaint that showed any involvement by any of these defendants in the claims asserted by plaintiffs, much less any acts by them of an ongoing nature such that they could be enjoined from performing those acts in the future. Moreover, as a practical matter, as Jesson, Benson and Prescott are no longer employees of MSOP, there is nothing the Court could enjoin them from doing. However, as for Liggett and Moser – assuming they are still employed by MSOP in the

same or comparable positions to the positions they held at the time plaintiff commenced his suit, and with duties that bear on the implementation of the MP or activities of the MRT – the Court will not recommend dismissal of claims for injunctive relief against them in their official capacity on the basis of the Ex parte Young doctrine.

### 3.   Individual Capacity Claims

Defendants contend that to the extent that the allegations against Jesson, Prescott, Carlson, Benson, Liggett and Lundquist are based on a theory of supervisory liability, those claims must fail, as they had no direct involvement with the events described in the Complaint, and the Complaint failed to allege any specific acts or omissions by them.[22]  Defs.' Mem., pp. 8-10.  Likewise, defendants submitted that to the extent plaintiff was attempting to hold all named defendants vicariously liable for the wrongdoing of their subordinates, those claims must be dismissed pursuant to Rule 12(b)(6), as the doctrine of respondeat superior does not apply to § 1983 claims.  Id., p. 11.

In response, plaintiff pointed to the requirement in the Minnesota Administrative Rules that MSOP staff "be knowledgable about the rights of persons in treatment under applicable laws and that staff be trained on "the application and compliance with Minnesota Statutes and rules related to treatment and services for sex offenders."  Pl.'s Resp., pp. 7-8 (citing Minn. R. 9515.3070).  Further, all MSOP policies are signed by Benson, which according to plaintiff establishes the requisite link between the misconduct and Benson's authorization or approval of the misconduct.  Id., p. 8.  Plaintiff also cited to general principles of respondeat superior.  Id., pp. 8-9.

---

[22]   Defendants made no mention of Moser in their argument on supervisory liability. Defs.' Mem., pp. 8-10.

To state an actionable § 1983 claim against a defendant in his or her personal capacity, a complainant must allege a set of historical facts, which, if proven true, would demonstrate that the defendant violated the complainant's federal constitutional rights while acting under color of state law.   West v. Atkins, 487 U.S. 42, 48 (1988). Furthermore, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights" protected by the Constitution.   Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990); Speed v. Ramsey Cnty., 954 F. Supp. 1392, 1397 (D. Minn. 1997) (same).   In other words, civil rights claimants must plead sufficient facts showing each named defendant's personal involvement in alleged constitutional wrongdoing.   Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir. 1999) (emphasis added); see also Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001) (upholding summary dismissal of civil rights claims, because plaintiff's complaint "failed to allege sufficient personal involvement by any of defendants to support such a claim").

Section 1983 actions against an individual cannot be premised on respondeat superior liability; a defendant can only be liable for his or her personal acts.   See Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014) ("To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights.") (citation omitted); Nelson v. Correctional Medical Services, 583 F.3d 522, 535 (8th Cir. 2009) ("[i]n a § 1983 case an official 'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor

liability") (quotation omitted); <u>White v. Holmes</u>, 21 F.3d 277, 280 (8th Cir. 1994) ("A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity.") (quoting <u>Bolin v. Black</u>, 875 F.2d 1343, 1347 (8th Cir.)*, <u>cert. denied</u>,* 493 U.S. 993 (1989)).  As such, general responsibility for supervising a facility is not sufficient to establish personal liability.  <u>See</u> <u>Estate of Rosenberg by Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995) (citing <u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987)).

"While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." <u>Jackson</u>, 747 F.3d at 543 (citations omitted); <u>see</u> <u>also</u> <u>Riehm v. Engelking</u>, 538 F.3d 952, 962–63 (8th Cir. 2008) ("A supervisor may be held individually liable under § 1983 if [s]he directly participates in the constitutional violation. . . . " (alteration in original) (quotation omitted).  As such, "a supervising officer can be liable for an inferior officer's constitutional violation only 'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'" <u>Parrish v. Ball</u>, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting <u>Otey v. Marshall</u>, 121 F.3d 1150, 1155 (8th Cir. 1997)).

Applying these principles to plaintiff's claims against defendants, the Court finds that he has alleged no facts regarding any relevant activities or conduct of Jesson, Prescott and Carlson.  Nowhere in the Complaint does plaintiff allege facts that suggest that any of these individuals personally participated in the denial of plaintiff's

constitutional rights, or that they failed to supervise or train an employee who caused a

violation.  As a result, claims against these defendants must be dismissed.

As for Benson, the Complaint alleged the following:

> "On information and belief, when Benson assumption [sic] of the role of Executive Director he immediately put into place many new and punitive and restrictive policies that appear to have an accumulative effect of removing our constitutional rights."[23]  Complaint, ¶ 32.

> "On information and belief, with Benson's assumption of the role of Executive Director, he installed senior administrative staffs whom were under this tenor [sic] while part of the Department of Corrections Moser and Carlson."  Complaint, ¶ 33.

> "Since Benson's role as the Executive Director of the MSOP, the Media review team, under his direction has been slowly moving away from the '2007 Media Policy' that was part of the original settlement of <u>Kruger v. Goodno</u>."  Complaint, ¶ 35.

> When Benson became the Executive Director of the MSOP, the movies that were previously approved …. have migrated to the prohibited list. " Complaint, ¶ 38.

Accepting these allegations as true, as this Court must do on a motion to

dismiss, the Complaint is devoid of any facts to support plaintiff's claim that Benson was

personally involved in directing the MRT to abandon the MP, the reclassification of

movies or magazines from the permitted or counter-therapeutic lists to the prohibited

list, or that Benson failed to supervise or train an employee who caused any such

alleged violations.  "A plaintiff must show an affirmative link between the misconduct

and the adoption of any plan or policy by the defendant showing the authorization or

approval of such conduct."  <u>Semler v. Ludeman</u>, Civ. No. 09-0732 (ADM/SRN), 2010

---

[23]   None of the policies referenced are at issue in this case.

WL 145275, at * (D. Minn. Jan. 08, 2010) (citations omitted).   Just because Benson

signed the MP does not create the necessary connection to support a claim that he

violated the policy or directed or trained others to violate the it.   Having failed plead

specific facts setting forth what Benson allegedly did or failed to do, while acting under

color of state law, which violated plaintiff's constitutional rights, any claims against

Benson in his individual capacity should be dismissed.

The Court reaches the same conclusion as to Lundquist.   Lundquist is only

referenced once in the body of the Complaint, where plaintiff stated:   "[e]ven on appeal,

the current Clinical Director Lundquist refuses to follow the guidelines of the "2007

Media Policy."   Complaint, ¶ 48.   The only other allegation that conceivably could relate

to Lundquist is the following:

> On information and belief, MSOP MRT has been routinely
> re-reviewing movies after having gone through the original
> process of further review by the Clinical Director [Lundquist]
> or his designated clinical team, because, on information and
> belief, the MSOP staff believes we (patients/clients) should
> not be allowed to have such media, and asked the MRT to
> overrule previously approved items such as designated
> through the appeal processes, that are designed to protect
> our First and Fourteenth Amendment Rights guaranteed
> under the United States Constitution.

Id., ¶ 52.

Even assuming that plaintiff was complaining about Lundquist in paragraph 52,

these conclusory allegations fall woefully short of the pleading requirements set forth in

Iqbal and Twombly.[24]   See Retro Television, 696 F.3d at 768 ("'[C]onclusory statements'

---

[24]    Defendants assumed that plaintiff was seeking to hold Lunquist liable for denying plaintiff's appeal to remove 162 movies from the prohibited list. See Defs.' Mem., p. 16. This Court cannot even read this assumption into the Complaint. The only exhibit that

and 'naked assertion[s] devoid of further factual enhancement'" are insufficient to satisfy this standard.).  Like Benson, there is nothing in Complaint describing what Lundquist did or failed to do, while acting under color of state law, which violated plaintiff's constitutional rights.  Any claims against Lundquist in his individual capacity should be dismissed.

On the other hand, plaintiff has stated sufficient facts as to Liggett's and Moser's personal involvement in the alleged deprivation of plaintiff's First Amendment rights.  Again accepting the allegations of the Complaint as true, as to Liggett, the MRT supervisor, plaintiff has alleged as follows:

> On March 8, 2011 Plantiff Stone wrote a "Client Request" to .
> . . Liggett, with the concern of the recent application of the of
> the 2007 Media Policy, not being followed and attached a
> copy of the "2007 Media Policy," the response signed "The
> MRT Team" stated "The MRT has the option to appeal any
> movie on the permitted list and have the movie reviewed by
> the Clinical Director.  If the movie is deemed prohibited by
> the Clinical Team, the movie is then moved to the prohibited
> list."

Complaint, ¶ 50 (citing Stone Aff., Ex. 5).  Liggett then verified that the answer was correct.  Stone Aff., Ex. 6.

The Complaint further alleged as to Liggett:

> On March 9, 2011, Plaintiff Stone wrote a response request,
> again to . . . Liggett, stating "The response seems to suggest
> that the Court action and subsequent order that created the
> "2007 Media Policy" that was installed to protect our First
> Amendment rights (both state and federal) that MSOP MRT
> is suggesting they have the "option" to appeal permitted
> movies per the court and deem these to be prohibited?
> What is the purpose of the Court, if MSOP believes they can

---

references the 162 movies is plaintiff's provision of the list to Moser.  Stone Aff., Ex. 2.
There is no reference to Lundquist in this exhibit.

override the Court's decision?  Response by . . . Liggett . . . states "A decision of NCF (no contraband found) on any media item is not a guarantee that it contains no violations or counter-therapeutic material.  Reports from clients or staff may point out a violation missed in the initial review.  As always, the final say on any media item will be handled by the Clinical Director or his designated clinical team."

Id., ¶ 51 (citing Stone Aff., Ex. 7).

As to Moser, the Complaint alleged:

On March 8, 2011, Plaintiff Stone had conversation [sic] with defendant Moser, regarding current MRT practices.  Moser indicated that MSOP was changing this "2007 Media Policy," to be in conformance with Minn. Stat. § 246B.04, Subd. 2, as written.  Plaintiff Stone reminded Moser that MSOP is required to follow the "2007 Media Policy" as written and it cannot be changed.  Kevin Moser's response was "Isn't Krueger dead? That policy no longer applies." Moser went on to say "I want to work together on this issue." And instructed Plaintiff Stone to submit a request with movies in question.

On March 10, 2011, Plaintiff Stone submitted a request with attached movies list of the 162 movies previously approved, requesting that these movies be properly replaced back to the original permitted and/or counter therapeutic list in which they came from. "To be in compliance with the 2007 Media Policy."  Response from Moser dated March 23, 2011 "I have been informed that a movie can be moved from one list to another list by the decision of the Clinical Director.  Thank you."

Id., ¶¶ 53, 54.

These facts are sufficient under Rule 8, Iqbal and Twombly to support plaintiff's claims that Liggett and Moser were directly involved in the unconstitutional application of the MP.  Plaintiff complained directly to both defendants in their roles as MRT Supervisor and Assistant Director of MSOP, respectively, regarding the application of the MP by the MRT.  Both took the position that the MP was being properly

33

implemented.  Whether true or not, the point is Liggett and Moser are sufficiently connected to plaintiff's claim that the MP is being applied in an unconstitutional manner.

Therefore, the Court recommends that plaintiff's claims against Jesson, Prescott, Carlson, Benson and Lundquist in their individual capacities be dismissed.  But as to Liggett and Moser, the Court finds that he has stated sufficient facts to proceed forward with his claims against them.  Consequently, the Court will proceed to address the merits of plaintiff's § 1983 claims against Liggett and Moser in their individual capacities.

a.      Constitutionality of Minn. Stat. § 246B.04 and Media Policy 2007

Before examining the substance of plaintiff's claims against Liggett and Moser, the Court first addresses plaintiff's claim that both Minn. Stat. § 246B.04, subd. 2 and the MP on their face violates the First Amendment.[25]  Complaint, ¶¶ 63, 66.

As a preliminary matter, the Court notes that there is a presumption in favor of constitutionality for state statutes.  See McGuire v. C & L Restaurant, Inc., 346 N.W.2d 605, 611 (Minn.1984) (citation omitted).  Consequently, courts "proceed with extreme caution before declaring a statute unconstitutional and do so only when absolutely necessary."  Id. (citation omitted).  A party challenging the constitutionality of a statute must prove beyond a reasonable doubt that the statute violates a constitutional provision.  In re Haggerty, 448 N.W.2d 363, 364 (Minn .1989).

In Ivey, the court rejected Ivey's constitutional challenge of Minn. Stat. § 246B.04, concluding that because subdivision 2 of the statute was embodied in the MP, any broader challenge to the statute would amount to a "pre-enforcement" challenge.

---

[25]     Plaintiff also claimed that the statute and MP violated the Fourteenth Amendment.  Complaint, ¶¶ 63, 66.  The Court addresses the Fourteenth Amendment argument, infra.

34

2008 WL 4527792, at *3.  "Even in the First Amendment context, such a challenge presents a justiciable controversy only if the probability of enforcement is real and substantial."  Id. (citation omitted).  "Here, the terms of the settlement of the Krueger litigation removed any real and immediate threat that subdivision 2, unmediated by the [MP] would be enforced against Ivey."  Id. at *4.  The same holds true here.  Plaintiff lacks standing to challenge any aspect of the statute not embodied in the MP

As for plaintiff's facial challenge to the constitutionality of the MP and that portion of Minn. Stat. § 246B.04 embodied in the MP, that issue has been previously analyzed and rejected by courts in this District.  See Semler, 2010 WL 145275 at *9 (relying summarily on Ivey to conclude that the MP and aspects of the MP embodied in Minn. Stat. § 246B.04 were facially constitutional and constitutional); Ivey, 2008 WL 4527792, at *5-7.

In Ivey the court considered the constitutionality of the MP pursuant to the factors set forth in Turner v. Safely, 482 U.S. 78 (1987)..[26]  These factors are: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.  Id. at *5.  The Ivey court found that as

---

[26]   "Most courts use the Turner factors to assess whether MSOP's policies and regulations are reasonably related to a legitimate therapeutic or institutional interest." Banks v. Jesson et. al., Civ. No. 11-1706 (SRN/JSM), 2016 WL 3566207, at *7 (D. Minn. June 27, 2016) (citing Karsjens v. Jesson, 6 F. Supp. 3d 916, 937 (D. Minn. 2014) (collecting cases using this "modified" Turner approach when addressing MSOP detainees' § 1983 claims).)

adapted to civilly committed individuals, the MP bore a rational relationship to the MSOP's goals of creating and maintaining an atmosphere conducive to its therapeutic goals and to reduce the danger of sexual aggression towards other civilly-committed patients or staff. Id. Patients have alternative means of exercising their rights, as the MP does not ban all media items depicting nudity, but only limited categories of materials. Id. Additionally, allowing the additional materials would negatively impact the institution by enabling trading of materials among patients. Id.; see also Semler, 2010 WL 145275, at *9 (concurring with the court's decision in Ivey that the Turner factors supported a finding that the MP was facially constitutional).

This Court finds the reasoning of the Ivey and Semler persuasive and plaintiff has alleged no facts that call into question the decision these courts made with respect to the facial constitutionality of the statute or the MP. Plaintiff's facial challenge to the constitutionality of the MP is rejected.

b.      Application of Minn. Stat. § 246B.04 and Media Policy 2007

The gist of plaintiff's Complaint is that defendants have abandoned the MP in favor of the statute in violation of the Krueger v. Goodno settlement and that to the extent they are applying the MP, they are doing so inconsistent with the policy and in violation of the the First and Fourteenth Amendments.

i.      First Amendment Claims

As a threshold matter, this Court rejects defendants' contention that plaintiff's allegations establish as a matter of law that defendants have not abandoned the MP in favor of the statute or are applying the MP in violation of plaintiff's constitutional rights. Defs. Mem., pp. 12-16. In essence, defendants want this Court to conclude that

notwithstanding the allegations in the Complaint, the exhibits submitted by plaintiff in connection with the Complaint establish as a matter of law that MSOP was acting consistent with the MP and in accordance with the First Amendment.  For example, defendants argued that Moser's statement to plaintiff that the MSOP was changing the MP to be in conformance with Minn. Stat. § 246B.04, subd. 2, as written, (Complaint, ¶ 53), showed that the MSOP did not "vitiate" the MP in favor of the statute.  Id., p. 13. Similarly, defendants maintained that plaintiff's allegation that Moser told him that a movie could be moved from one list to another at the direction of the clinical director, (Complaint, ¶ 54), was consistent with paragraph D of the MP, which allows the Clinical Director to make a final determination regarding the classification of material when requested to do so.  Id., p. 14.  In the same vein, defendants posited that Moser's statement "isn't Krueger dead?  That policy no longer applied," (Complaint, ¶ 53), coupled with Moser's statement that he wanted to work with plaintiff on the issue and instructed plaintiff to send him a list of the movies that had been moved from the permitted to the prohibited list, established that the MP had not been abandoned.[27]  Id., p. 13.

As for Liggett, defendants contended that his statements to plaintiff showed that the MP was being followed because the MP allows the MRT to assess media material,

---

[27]     In making this argument, defendants omitted Moser's follow-up response after receiving the list of movies from plaintiff.  On March 10, 2011, plaintiff sent the list to Moser and asked that the movies be re-classified as "Permitted" or "Counter-therapeutic."  Complaint, ¶ 54; Stone Aff., Ex. 2, p. 7.  Moser responded on March 23, 2011, that he "had been informed that a movie can be moved from one list to another list by the decision of the Clinical Director.  Thank you."  Id., p. 6.  This response does not lead the Court to conclude that Moser was willing to work with plaintiff on his complaint.

remove prohibited materials under the contraband policy and request that the Clinical Director review media.  Defs.' Mem., p. 15.  Further, the MP does not prohibit the re-screening of media materials, "consequently, [Liggett's] statements conform with the Media Policy."  Id.

Defendants' contentions to the contrary, these examples show at a minimum there are fact disputes about the very essence of plaintiff's claims.  They certainly do not lead to the conclusion that as a matter of law plaintiff's allegations regarding Moser and Liggett did not state a claim as a matter of law.

As to the specific media materials plaintiff has challenged, first, defendants addressed the 162 movies at issue in which plaintiff alleged: (1) these movies had formerly been deemed "Permitted" or "Counter-therapeutic" but now they are classified as "Prohibited," (Complaint, ¶ 38); (2) the MP does not allow for "re-review" of media, (Id., ¶¶ 40, 52); (3) plaintiff specifically requested that the movies be re-classified as "Permitted," (Id., ¶ 54); and (4) Moser's response to this request was that movies could be moved from one list to another by the Clinical Director.  Complaint, ¶ 54, Stone Aff., Ex. 2, p. 6.

Defendants contended that plaintiff's claims as to classification of the 162 movies failed to state a claim as the allegations lacked any detail regarding the content of the 162 movies, how any of the named defendants were involved in prohibiting the 162 movies, and how plaintiff was injured by prohibiting the movies.  Defs.' Mem., p. 14. Defendants also cited as evidence plaintiff's statement that the MSOP claimed to have reviewed the movies "in accordance with the letter of the law."  Id., p. 14 (citing Complaint, ¶ 38).

These arguments misstate plaintiff's burden in withstanding a Rule 12(b)(6) motion.   As previously discussed, "a complaint need not contain 'detailed factual allegations,' . . . ."   United States ex rel. Raynor, 690 F.3d at 955 (8th Cir. 2012) (quoting Twombly, 550 U.S. at 555).   "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"   Kelly, 813 F.3d at 1075 (8th Cir. 2016) (citation omitted).   Taken as a whole, plaintiff has sufficiently alleged that the 162 films were arbitrarily re-classified and in contravention of the MP.   Moser's statement that movies can be moved from one list to another by the Clinical Director, (Stone Aff., Ex. 2), and Liggett's statement that the "final say" on any media item belongs to the Clinical Director, (Stone Aff., Ex. 7), neither addresses nor relieves the MSOP of its duty to act in compliance with the MP, in a way that is "consistent with the constitutional rights of civilly-committed patients."   MP, p. 1.   As for plaintiff's statement that the movies were "reviewed in accordance with the letter of the law," it is clear that he was merely repeating what he was told by MSOP, which he emphatically rejected as an adequate explanation.   On this record, the Court cannot conclude that plaintiff's allegations that the 162 movies were arbitrarily re-classified in violation of the MP and his constitutional rights fail as a matter of law.

Defendants next addressed plaintiff's challenge of the classification of the American Girl movie, the prohibited magazines and Movies Unlimited catalogs under Turner.   Defs.' Mem., pp. 17-24.   According to defendants, the Turner factors all support a conclusion that classification of the materials was constitutionally sound.   Id.

The Court disagrees for the simple reason that it has no record before it on which it analyze, much less determine, that consistent with the Turner factors, defendants applied the MP in a constitutionally sound manner with respect to these materials . Unlike another suit in this District, Banks v. Jesson et. al., Civ. No. 11-1706 (SRN/JSM), 2016 WL 3566207 (D. Minn. June 27, 2016), where a MSOP patient challenged the constitutionality of the MSOP's confiscation of media items under the MP and contraband policies, and defendants submitted numerous affidavits from the MSOP clinicians and officials (including Moser and Liggett) to explain the grounds for their decisions on the specific materials, (Civ. No. 11-1706, Docket Nos. 23-42), here, there is no record from which the Court can conduct a proper analysis under Turner.[28]   In short, plaintiff has sufficiently alleged that the challenged materials were classified in a way that violated his constitutional rights, and given the posture of the case, the Court has no facts or evidence before it to conclude that he is wrong as a matter of law.  The Court, therefore, recommends denying defendants' motion with respect to American

---

[28]   In Banks, an MSOP patient asserted § 1983 claims against several state defendants, including Jesson, Benson, Moser, and Lundquist, alleging that the defendants seized materials as contraband in violation of the MP.   On summary judgment, now-retired Magistrate Judge Keyes employed the Turner factors and determined that as to some materials, plaintiff's constitutional rights were not violated, but as to other materials, the defendants "have not come forward with any evidence to show how any of these publication violated MSOP's Medial Policy or otherwise constituted contraband."   Report and Recommendation, pp. 33-35.   Magistrate Judge Keyes recommended allowing challenges to as to those latter materials to proceed.   Id., pp. 34-34.   The District Court adopted the Report and Recommendation in its entirety. Banks, 2016 WL 3566207, at *1.

Girl; Kickass 2010; the challenged issues of Details, Interview, Professional Photographer; and the Movies Unlimited catalogs.[29]

Lastly, the Court addresses plaintiff's claims that defendants' "determinations and subsequent demanding plaintiff to send out as [sic] Plaintiff's expense, plaintiff's Media (DVD's books, magazines, letters, etc….)," infringed his First Amendment rights of freedom of thought and expression. Complaint, ¶ 55. This allegation is wholly conclusory, unsupported by any facts, and does not even attempt to relate actions by Moser, Liggett or any of the other named defendants to this claim. As a result, the Court recommends that this claim be dismissed without prejudice.

ii.    Fourteenth Amendment Claims

Plaintiff has asserted that defendants violated his Fourteenth Amendment rights by deeming materials prohibited without due process of law. Complaint, ¶¶ 1, 2. Assuming that plaintiff was asserting a procedural due process claim, defendants contended that the MP contains a right of appeal and plaintiff has not contended that he was denied this right; rather, his claim is only that he disagreed with the ultimate decision regarding the classification of the 162 movies. Id., p. 27.

When a MSOP patient asserts a procedural due process claim, the Eighth Circuit has held that the nature of their constitutional rights "must be understood in the context of that commitment and its accompanying restrictions." Senty-Haugen v. Goodno, 462 F.3d 876, 886 (8th Cir. 2006). A procedural due process claim is reviewed in two steps. Id. First, the Court asks if the plaintiff was deprived of a protected liberty or property

---

[29]    Defendants stated that a MRT review sheet for "Kickass 2010" was attached to the Complaint. Defs.' Mem., p. 20. The only review sheets attached to the Complaint were for "American Girl: Chrissa Stand Strong" and "Boogyman 2." Stone Aff., Ex. 7, p. 10, Ex. 8.

interest.  Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 445-46 (8th Cir. 1995).  At the second step, if the plaintiff has a protected interest, the court considers what process is due by balancing the specific interest affected, the likelihood that the applicable procedures would result in an erroneous deprivation of rights and the affected program's interest in providing the process it did, including the administrative costs and burdens of providing additional process.  Senty-Haugen, 462 F.3d at 886 (citing Mathews v. Eldridge, 424 U.S. 319, 332-35 (1976)).

The Complaint is devoid of factual support for plaintiff's claim that he was denied procedural due process.  Therefore, the Court concludes that the Complaint failed to adequately allege a Fourteenth Amendment procedural due process violation, and recommends that this claim be dismissed.[30]

### iii.    Fourteenth Amendment Equal Protection Claim

Plaintiff has alleged that defendants violated his equal protection rights. Complaint, ¶¶ 60, 61.  This allegation is tied to defendants' allegedly unconstitutional interpretation and implementation of the MP, but the Complaint does not otherwise elaborate on this claim.

---

[30]    Having scoured the Complaint, the Court could not find any mention of an alleged violation of plaintiff's Fourteenth Amendment substantive due process rights, and this Court will not read such a claim into the Complaint.  At any rate, to the extent the Complaint did invoke a substantive due process claim, any such claim is subsumed by plaintiff's First Amendment claim.  "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim."  Albright v. Oliver, 510 U.S. 266, 273 (1994) (internal quotations omitted); Mattson v. Becker Cnty, Civ. No. 07-1788 (ADM/RLE), 2008 WL 3582781, at *5 (D. Minn. Aug. 12, 2008) (relying on Albright for the proposition that a claim asserted under the Fourteenth Amendment was better analyzed under the Sixth Amendment).

In his response, plaintiff stated that his equal protection claim is based on what he perceives to be a difference between the "liberties and property limits" afforded patients committed as "Mentally Ill and Dangerous or Mentally Ill" and those, like him, confined as Psychopathic Personalities.  Pl.'s Resp., pp. 15-16.  These allegations were not pled in the Complaint and this Court must confine its analysis of plaintiff's equal protection claim to that which was actually pled.  See Burns v. Winroc Corp. (Midwest), 565 F. Supp. 2d 1056, 1068 (D. Minn. 2008) (declining to consider a claim raised in plaintiffs' brief in opposition to summary judgment, but not pled in complaint); LaFleche v. Clark Prods., Inc., Civ. No.  05-2549 (MJD/AJB), 2007 WL 2023564 at *15 (D. Minn. July 9, 2007) (claims not pled in complaint subject to dismissal); Sabhari v. Cangemi, Civ. No. 04-1104 (ADM/JSM), 2005 WL 1387595 at *7 (D. Minn. June 10, 2005 (claims not pled in the complaint and raised for the first time in plaintiff's response to defendants' motion for summary judgment are not properly before the court).

The Fourteenth Amendment provides that no state "shall deny any person within its jurisdiction the equal protection of the laws."  United States Constit. Amend. XIV.  To prevail on an equal protection claim, a plaintiff must prove that he has been treated differently from other similarly situated individual, either by operation of state law, or through the actions of a state official.  Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("In general, the Equal Protection Clause requires that state actors treat similarly situated people alike.").

To adequately plead an equal protection claim, plaintiff was required to allege: (1) defendants treated similarly situated classes of patients differently; (2) the differing treatment was unrelated to a rational penal interest; and (3) the differing treatment was

reflective of intentional or purposeful discrimination.  <u>Pittman v. Jesson</u>, Civ. No. 12-1410 (SRN/TJN), 2014 WL 4954286, at *10 (D. Minn. Sept. 30, 2014).

Plaintiff has not alleged that he is similarly situated to any other persons, and does not allege that he is being treated differently from others.  In fact, the Complaint appears to allege that <u>all</u> patients of the MSOP are being treated unfairly through the unconstitutional interpretation and application of the MP.  As the Complaint is completely devoid of any facts that would support the threshold pleading requirements for an equal protection claim, the Court recommends that it be dismissed.

iv.    Access to the Courts Claim

Plaintiff has alleged that defendants' policies and practices have substantially interfered with his right to "petition the government for redress of his grievances and right of access to the courts to challenge confinement and seek redress of his constitutional rights."  Complaint, ¶ 57.  In the Complaint, plaintiff alleged that he has filed several <u>pro</u> <u>se</u> lawsuits challenging the terms and conditions of his commitment and confinement and wishes to file additional suits.  <u>Id.</u>, ¶ 21.  Over the course of twelve years, plaintiff accumulated "countless" legal materials, including copies of cases, statutes and administrative regulations.  <u>Id.</u>, ¶ 22.  Plaintiff alleged that he had copies of reports by the Hospital Review Board dated 2001 and 2005, which were confiscated and not returned to him.  <u>Id.</u>, ¶ 23.  Plaintiff did not allege that any of his legal materials were taken.  Plaintiff did not allege what impact confiscation of the Hospital Review Board reports have had on his ability to access the courts.

In his response to defendants' motion to dismiss, plaintiff also complained about the fact that until September, 2010, patients at MSOP had access to Westlaw but now

must use Lexis/Nexis, which is provided in a form that limits his access to published cases only and provides limited access to Minnesota state court cases.  Pl.'s Resp., p. 13.[31]   Plaintiff also contended that the defendants' attorney referenced unpublished cases in defendants' brief in support of their motion to dismiss, which disadvantaged plaintiff in responding to the motion because he does not have access to unpublished cases through the Lexis/Nexis version that he is allowed to use.  Id., p. 4.  These allegations are not reflected in the Complaint.

"[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."  Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983) (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)).  To state a claim for relief, a plaintiff must allege that he or she suffered an actual injury caused by the limited access, such as the inability to file a complaint or the dismissal of a claim.  See Lewis v. Casey, 518 U.S. 343, 351 (1996); Bandy–Bey v. Crist, 578 F.3d 763, 765 (8th Cir. 2009) (access to the courts claim requires "actual injury"); White v. Kautzky, 494 F.3d 677, 680 (8th Cir. 2007) ("To prove a violation of meaningful access to courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a non-frivolous and arguably meritorious underlying legal claim."); see also Lewis, 518 U.S. at 353 (to prove "actual injury" a plaintiff must show "that a nonfrivolous legal claim had been frustrated or was being impeded.").  The actual

---

[31]   As an example, plaintiff noted that he did not have access to Minnesota cases that "reversed any other conditions of MSOP, including but not limited to Hince v. O'Keefe, 632 N.W.2d 577 (Minn. 2001).

injury requirement is an element of standing.  Lewis, 518 U.S. at 349.  At the pleading

stage, "the complaint should state the underlying claim in accordance with Federal Rule

of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain

statement should describe any remedy available under the access claim and presently

unique to it."  Foust v. Hall, No. Civ. No. 216-0142, 2016 WL 3019394, at *3 (E.D. Cal.

May 26, 2016) (citing Christopher v. Harbury, 536 U.S. 403, 417-18 (2002) (footnote

omitted))

As pled, plaintiff's access to courts claim fails as a matter of law.  First, he did not

allege that he sustained an actual injury resulting from the confiscation of the Hospital

Board Reports.  Second, he did not describe how these Reports related to any legal

claim that he wanted to file or how Liggett or Moser (or any of the named defendants,

for that matter), were involved in the confiscation of these materials.  Instead, plaintiff

only asserted in the most general terms that the Reports showed "the plight of his

current confinement within MSOP."  Complaint, ¶ 23.

As for MSOP's decision to provide access to legal research though Lexis/Nexis

rather than Westlaw, or that defendants did not attach copies of unpublished decisions

to their brief, these claims are not reflected in the Complaint and cannot be raised by

plaintiff in his responsive memorandum.  In any event, plaintiff failed to identify any

cases he was unable to review or how his lack of access to these cases impacted his

ability to respond to defendants' motion.  A plaintiff cannot "establish relevant actual

injury by establishing that his prison law library or legal assistance program is subpar in

some theoretical sense."  Lewis, 518 U.S. 351.  As a result, plaintiff's failure to articulate

any actual injury that he suffered as a result of being required to use the MSOP's

Lexis/Nexis electronic research system or because defendants failed to provide him with copies of unpublished cases cited in their brief, precludes an access to the courts claim. [32]

For all of these reasons, this Court concludes that plaintiff's allegations are insufficient sustain an access to courts violation, and should be dismissed.

### 3.     Qualified Immunity

Defendants asserted that they are entitled to qualified immunity because the named defendants were not on notice that they were violating plaintiff's constitutional rights and, as a result they were entitled to qualified immunity.   Defs.' Mem., p. 33. Further, defendants claimed the plaintiff failed to allege sufficient facts to show that defendants deviated from the MP to the point of violating his Constitutional rights. Defs.' Reply, p. 11.

"Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in [her] individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable

---

[32]   To the extent that defendants are relying on decisions that they know plaintiff cannot access through Lexis/Nexis, they are required by the Local Rules for the District Court of Minnesota to append copies of these decisions to their papers.

> **Citing Judicial Dispositions**. If a judicial opinion, order, judgment, or other written disposition cited by a party is available in a publicly accessible electronic database, the party is not required to file and serve a copy of that document. But if a judicial opinion, order, judgment, or other written disposition cited by a party is not available in a publicly accessible electronic database, the party must file and serve a copy of that document as an exhibit to the memorandum in which the party cites it.

7.1(k).

person would have known.'"   Hager v. Arkansas Dep't of Health, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).   The Court must consider (1) "whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right," and (2) "whether the right was clearly established at the time of the alleged infraction." Hager, 735 F.3d at 1013–14.   If both of these questions are answered affirmatively, then the official is not entitled to immunity. Id.   A constitutional right is clearly established if "a reasonable official would understand that what he is doing violates [the plaintiff's right]."   Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).   The Court must grant qualified immunity to a government official, in her individual capacity, if "immunity can be established on the face of the complaint." Bradford v. Huckabee, 330 F.3d 1038, 1041 (8th Cir. 2003).

As discussed in connection with plaintiff's First Amendment claims against Liggett and Moser, the Complaint asserts that they were involved in the challenged materials being classified in contravention of the MP and in violation of plaintiff's constitutional rights.   Accepting these allegations as true, at this stage of the suit, the Court cannot conclude that these defendants are entitled to qualified immunity as a matter of law.  .

### C.   Plaintiff's Request for a Permanent Injunction [Docket No. 18]

Plaintiff filed a pleading entitled "Plaintiff's Request for Permanent Injunction." [Docket No. 18].   This motion sought an order permanently enjoining the named defendants from: (1) tampering with the U.S. mail from the courts or the Minnesota Attorney General's Office; (2) holding, opening, or investigating mail and requiring that

mail be delivered to plaintiff on the day of its arrival; (3) retaliating against plaintiff for bringing his current lawsuit; and (4) inflicting mental or emotional injury on plaintiff or taking action that could be construed as inflicting mental or emotional injury.  Id., p. 1. Plaintiff attached copies of two MSOP mail policies to his motion—Policy No. 302.030, "Client Mail," and Policy No. 106.010 "Responding to Legal Actions."   Affidavit of Charles Richard Stone, Exs. 9, 10 [Docket No. 19].  Plaintiff's motion was unsupported by a memorandum of law, an affidavit (apart from Stone's affidavit attaching copies of the policies), or any other evidence that would support his allegation that the defendants have been tampering with his mail.   As best as the Court can tell, plaintiff's motion relates to a letter he sent to the Assistant Attorney General representing the defendants in the instant lawsuit, complaining that he had not been receiving mail relating to his legal cases, including this case.  See letter dated July 13, 2011 from Richard Charles Stone to Ricardio Figuero, Assistant Attorney General.   [Docket No. 25].Defendants opposed this motion on the ground that it was improperly brought – it should be addressed in a separate action and there was no factual basis for plaintiff's assertion that named defendants were tampering with his mail.  Defs.' Reply, p. 3.  The Court agrees.

First, the motion should be denied for failure to comply with Local Rule 7.1(c)(A), which requires the submission of a memorandum of law in connection with any dispositive motion.[33]

Second, the motion raises issues that have not been pled in the Complaint and are not properly before the Court in connection with this case.  A court may issue a

---

[33]    L.R. 7.1(c)(6) deems a motion for injunctive relief as a dispositive motion.

preliminary injunction in a lawsuit "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the <u>lawsuit's merits</u>. * * * Thus, a party must establish that relationship between the injury claimed in the party's motion and the conduct asserted <u>in the complaint</u>." <u>Devose v. Herrington</u>, 42 F.3d 470, 471 (8th Cir. 1994) (affirming district court's order denying prisoner's motion for a preliminary injunction, which raised issues "entirely different" from those raised in his complaint) (emphasis added); <u>Jihad v. Fabian</u>, Civ. No. 09-1604 (DSD/RLE), 2010 WL 1780238, at *4 (D. Minn. Mar. 30, 2010) (recommending denial of plaintiff's motion for a temporary restraining order or preliminary injunction because his motion unrelated to his claims in the complaint) (Report and Recommendation adopted 2010 WL 1780236 (D. Minn. May 4, 2010)); <u>Banks v. Ludeman</u>, Civ. No. 08-5792 (MJD/JJK), 2010 WL 1507601, at *3 (D. Minn. Mar. 9, 2010) (recommending denial of plaintiff's motion for a preliminary injunction and noting that plaintiff's request "does not relate in any way to the relief he seeks in his complaint.") (Report and Recommendation adopted 2010 WL 1507011 (D. Minn. Apr. 14, 2011)).  Although these cases relate to preliminary injunctions, this Court finds that the reasoning applies equally to plaintiff's motion for a permanent injunction. The claims raised by his motion for a permanent injunction are not properly before the Court because they are not part of his Complaint.

Third, even if the motion for a permanent injunction were properly before the Court, it fails on the merits.

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant most obtain success on the merits." <u>Bank One, Utah v. Guttau</u>, 190 F.3d 844, 847 (8th Cir.

1999) (citation omitted). In determining whether a preliminary injunction should be issued, a district court must consider the threat of irreparable harm to the movant, the balance between the harm to the movant versus the harm to the opposing party if the injunction is granted, the probability of success on the merits and the public interest. Powell v. Noble, 798 F.3d 690, 697 (8th Cir. 2015) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

Plaintiff has provided no facts to support the claims raised in his motion— tampering with "legal mail," the infliction of mental and emotional injuries on plaintiff and retaliation. As a result, there is no evidence before this Court that address, much less support any of the Dataphase factors. Therefore, the Court recommends that plaintiff's Motion for a Permanent Injunction be denied.

### D. Defendants' Motion to Stay Discovery

Defendants have moved to stay the written discovery plaintiff served on July 5, 2011. Defs.' Reply, p. 11. This "motion" was presented only in the context of defendants' reply brief and is not properly before the Court. Id. At any rate, no discovery should take place before the District Court had issued an Order in connection with the instant motion.

### E. Plaintiff's Motion to Dismiss Defendants' Motion to Dismiss [Docket No. 26]

Plaintiff's motion appeared to be based on his concern that he had not yet received defendants' memorandum of law in support of their motion to dismiss and his concern that there had been ex parte communication between defendants' counsel and the Court. Id. Plaintiff's written discovery requests were attached to his motion papers.

In light of the fact that plaintiff ultimately received defendants' motion papers, had the opportunity to respond and did respond, the Court recommends denying this motion as moot.  There was no ex parte communication between defendant's counsel and the Court.

## IV.  CONCLUSION

Having determined that all but plaintiff's First Amendment claims against Liggett and Moser should be dismissed, the Court must decide whether dismissal of the remaining claims should be with or without prejudice.

As a general rule, when an action is dismissed for lack of subject matter jurisdiction, it is dismissed without prejudice, because the dismissal is not on the merits. See O'Grady v. Marathon Cnty. Child Support Agency, Civ. No. 05-2418 (JNE/JJG), 2006 WL 1715473 at *1 (D. Minn. June 19, 2006) (citing Frederiksen v. City of Lockport, 384 F.3d 437, 438-39 (7th Cir. 2004)).  "A jurisdictional disposition is conclusive on the jurisdictional question: the plaintiff cannot re-file in federal court. But it is without prejudice on the merits, which are open to review in state court to the extent the state's law of preclusion permits."  Id. (quoting Frederiksen, 384 F.3d at 438); cf. Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006) ("[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims."); County of Mille Lacs v. Benjamin, 361 F.3d 460, 464 (8th Cir.2004) ("A district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent.")).

Applying these principles, the Court reaches the following conclusions:

Plaintiff's § 1983 claims for damages against all defendants in their official capacities should be dismissed based on Eleventh Amendment immunity and therefore, should be dismissed without prejudice.

Plaintiff's § 1983 official capacity claims for prospective injunctive relief as to Jesson, Prescott, Carlson, Benson and Lundquist should be dismissed without prejudice. The Complaint insufficiently pled any involvement of these defendants in the claims asserted by plaintiff or on-going acts such that they are subject to an injunction.

Plaintiff's § 1983 individual capacity claims against Jesson, Prescott, Carlson, Benson and Lundquist should be dismissed without prejudice. The Complaint did not sufficiently allege any personal involvement of these defendants in the events described in the Complaint.

Plaintiff's claim that the MP and Minn. Stat. § 246B.04 are facially unconstitutional should be dismissed with prejudice. The facial constitutionality of the MP and the aspects of Minn. Stat. § 246B.04 embodied in the MP have been established.

Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed without prejudice. The Complaint did not sufficiently plead procedural due process violations. Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed with prejudice. Any such claim is subsumed within his First Amendment claim.

Plaintiff's Fourteenth Amendment equal protection claim should be dismissed without prejudice. The Complaint failed to allege that plaintiff was similarly situated to any other persons and did not allege that he was being treated differently from others.

As a result, the Complaint failed to meet the threshold pleading requirement for an equal protection claim.

Plaintiff's access to courts claim should be dismissed without prejudice.  Plaintiff failed to allege such a claim with any specificity and most of his allegations with respect to this claim are not properly before this Court as they are reflected in his response to defendant's motion to dismiss, not his Complaint.  .

## V.   RECOMMENDATION

Applying the above parameters, and for all the reasons stated in this decision, **IT IS HEREBY RECOMMENDED THAT** the defendants' Motion to Dismiss [Docket No. 9] be **GRANTED** in part and **DENIED** in part as follows:

1.     All § 1983 claims for damages against all defendants in their official capacities should be dismissed WITH PREJUDICE.

2.     All § 1983 official capacity claims for prospective injunctive relief as to Jesson, Prescott, Carlson, Benson and Lundquist should be dismissed WITHOUT PREJUDICE.

3.     All claims seeking dismissal of plaintiff's § 1983 official capacity claims for prospective injunctive relief against Liggett and Moser should be DENIED.

4.     All § 1983 individual capacity claims against Jesson, Prescott, Carlson, Benson and Lundquist should be dismissed WITHOUT PREJUDICE.

5.     All claims seeking dismissal of plaintiff's § 1983 individual capacity claims against Liggett and Moser should be DENIED.

6.     All claims challenging the facial constitutionality of the MP and Minn. Stat. § 246B.04 should be DISMISSED WITH PREJUDICE.

7.     All Fourteenth Amendment procedural due process claims should be dismissed WITHOUT PREJUDICE.

8.     Any Fourteenth Amendment substantive due process claim should be dismissed WITH PREJUDICE.

9.     The Fourteenth Amendment equal protection claim should be dismissed WITHOUT PREJUDICE.

10.     The access to the courts claim should be dismissed WITHOUT PREJUDICE.

10.     Plaintiff's Request for a Permanent Injunction [Docket No. 18] should be DENIED.

11.     Plaintiff's Motion to Dismiss Defendants' Motion to Dismiss [Docket No. 26] should be DENIED.


July 15, 2016                          *Janie S. Mayeron*
                                       JANIE S. MAYERON
                                       United States Magistrate Judge



## NOTICE

**Filing Objections:**   This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing**.**  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.