UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles Richard Stone,<br><br>Plaintiff,<br><br>v.<br><br>Lucinda E. Jesson, Dennis L. Benson, Thomas Lundquist, Kevin Moser, David Prescott, and Robert D. Liggett,<br><br>Defendants. | Case No. 11-cv-0951 (WMW/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Dennis L. Benson, Lucinda E. Jesson, Robert D. Liggett, Thomas Lundquist, Kevin Moser, and David Prescott's Motion for Summary Judgment [Doc. No. 145]. For the reasons that follow, the Court recommends that the motion be granted.

I.  **Introduction**

Plaintiff Charles Richard Stone ("Stone") is a civilly committed sex offender housed at a facility maintained by the Minnesota Sex Offender Program ("MSOP") in Moose Lake, Minnesota. (Compl. ¶¶ 7, 24 [Doc. No. 1].)  He is representing himself pro se.  Stone brought this lawsuit in April 2011 to challenge Defendants' application of a policy governing media possession adopted by MSOP in 2007 ("2007 Media Policy").[1]

---

[1] The 2007 Media Policy was in effect when Stone filed his Complaint but has since been amended several times. (*See* Compl. ¶ 6; Elsen Decl. ¶¶ 7–8 [Doc. No. 151].)

(Compl. ¶ 3.) Stone's only claim to survive a motion to dismiss is an official-capacity claim for prospective injunctive relief arising from Defendants' review and classification of certain movies and publications under MSOP's policy governing the possession of media by MSOP clients. (Am. Order at 2, 6, 17–18, Mar. 17, 2017 [Doc. No. 50].) To be clear, the remaining claim challenges the manner in which Defendants applied the policy; Stone's facial challenge was dismissed with prejudice. (*Id.* at 9, 16, 20.)

## II.   Background

The Court incorporates by reference here the Background section of the District Court's Order on the motion to dismiss. (*Id.* at 2–4.) Additional facts relevant to the motion for summary judgment are summarized below.

Stone was civilly committed as a psychopathic personality in 1985. *See In re Stone*, 376 N.W.2d 511, 512 (Minn. Ct. App. 1985). The term "psychopathic personality" has since evolved into a classification of "sexual psychopathic personality." *See In re Civil Commitment of Stone*, No. A18-1367, 2019 WL 1006807, at *1 n.1 (Minn. Ct. App. Mar. 4, 2019) (citation omitted), *review denied* (May 28, 2019). Stone's recent petition for provisional discharge was denied earlier this year. *Id.* at *1.

Dr. Nicole Elsen is the MSOP's Assessment Director, Chair of the Media Policy Committee, and a member of the Media Review Team ("MRT"). (Elsen Decl. ¶¶ 1, 3 [Doc. No. 151].) According to Dr. Elsen, the treatment of sex offenders usually involves restricting their exposure to sexually explicit materials that contain nudity, sexual activity, or depictions of sexual violence or abuse. (*Id.* ¶ 3.) The restrictions assist in the treatment of individual clients, as well as in the management of the overall programming

2

environment to reduce the risk of deviancy for individuals who commonly exhibit sexual compulsivity and hyper-sexuality. (*Id.*) The restrictions also thwart clients from using sexually explicit materials as a commodity; such materials frequently are purchased and shared among clients, which promotes deviancy and impedes treatment. (*Id.*) The MRT ensure that media introduced into MSOP facilities comports with the goals of providing a safe and effective therapeutic environment. (*Id.* ¶ 1.)

The 2007 Media Policy prohibited for all clients ten categories of materials designated as obscene, pornographic, or otherwise prohibited.[2] (Stone Aff. Ex. 1 at 2, Apr. 11, 2011 [Doc. No. 2-1] ("2007 Media Policy").) Category No. 8 proscribed

> [p]ictures, videos or reading materials that, taken as a whole, promote sexual violence, child molestation, or incest or that, taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines such as *Playboy*, *Penthouse* and *Hustler*.

(*Id.*) Stone interprets the word "predominantly" to mean that MSOP cannot prohibit media unless it contains "50% or more" sexual content or nudity. (Stone Decl. ¶ 63 [Doc. No. 189]; Anderson Decl. Ex. 1 (Stone Dep. at 107, 177–78) [Doc. No. 157].) The 2007 Media Policy did not categorically prohibit "R-rated" and "Unrated" movies, but provided for individual review by the MRT. (2007 Media Policy at 3.) "G," "PG," and "PG-13" movies were allowed without need for individual review. (*Id.*) The 2007 Media Policy has been revised several times since it was adopted. (*See* Stone Decl. ¶ 7.)

---

[2] The 2007 Media Policy also established procedures for "counter-therapeutic materials," which "may be possessed by patients, but the patient's decision to keep such materials will be noted in their records as counter-therapeutic." (2007 Media Policy at 3.) This designation is made largely on an individual basis.

3

Stone contends that a settlement reached in a case brought by another MSOP client precludes MSOP from deviating from the 2007 Media Policy in determining whether media is allowed or prohibited. (Stone Decl. ¶¶ 16, 21, 25.) Specifically, Stone claims that the settlement in *Kruger v. Goodno*, Civ. No. 05-2078 (JRT/FLN) (D. Minn.),[3] requires MSOP to adhere strictly to the 2007 Media Policy. (Compl. ¶ 3.) He further contends that any deviation from the 2007 Media Policy and any re-review of media previously approved pursuant to the 2007 Media Policy are unconstitutional. (Stone Decl. ¶¶ 25–27.) Stone challenges the MRT's practice of reviewing all incoming media, regardless of its rating and whether it was previously approved under the 2007 Media Policy. (*Id.* ¶ 27.) He also objects to the MRT's classification of some movies rated G, PG, and PG-13, as "Unrated" or "Not Rated." (*Id.* ¶ 28.)

After Stone initiated this action, MSOP staff re-reviewed the media specifically identified in the Complaint pursuant to the most recent version of the media policy, which was adopted in February 2019. (*See* Defs.' Mem. Supp. Mot. Summ. J. at 14 [Doc. No. 147]; Puffer Decl. ¶¶ 5–6 [Doc. No. 154].) Until recently, an MRT decision about specific media was documented only in the file of the client who requested the review. (Puffer Decl. ¶ 4.) Because decisions were not maintained in a central location, Defendants could not determine for each movie or publication at issue when the initial review occurred, which official conducted the review, which version of the policy was

---

[3] The 2007 Media Policy was adopted as part of the *Kruger* settlement. *See Ivey v. Mooney*, No. 05-cv-2666 (JRT/FLN), 2008 WL 4527792, at *1 (D. Minn. Sept. 30, 2008). The procedural background and history of the settlement is provided in *Ivey*.

4

applied, and the reasons the media was deemed prohibited. (*Id.*) Defendants concede the results of the media reviews conducted after Stone filed his case do not align perfectly with previous determinations, but explain that the inconsistencies are due to reasonable differences in clinical opinions, subjective definitions, or changes in the media policies over time. (Elsen Decl. ¶ 6; Puffer Decl. ¶ 11.) A small number of movies and publications are no longer commercially available and thus could not be reviewed by MSOP. (Geil Decl. ¶¶ 4–5 [Doc. No. 152].)

MSOP's current practice is to deem all G, PG, and PG-13 movies permitted, and no such rated movies are currently on the prohibited list. (Puffer Decl. ¶ 8.) Media that continues to be prohibited to Stone includes: (1) media depicting or promoting sexual violence or sexual abuse; (2) media describing or depicting minor nudity or sexual activity involving minors; (3) media that predominantly and prominently displays nudity or sexual conduct, and has the primary purpose of sexual arousal, and reading materials showing nudity; and (4) "box sets" and "Not Rated" or "Unrated" versions of media that do not fall within a policy exception. (Defs.' Mem. at 16–18; Puffer Decl. ¶ 9, Ex. 3.) Media that has been deemed counter-therapeutic to Stone includes the movie "American Girl: Chrissa Stands Strong." (Defs.' Mem. at 18; Puffer Decl. ¶ 10.)

The crux of the dispute in this case is whether Defendants' alleged departures from the 2007 Media Policy violate Stone's First Amendment rights. This question has two aspects: (1) whether Defendants' re-review and reclassification of certain media that was previously permitted under the 2007 Media Policy violated Stone's First Amendment rights and (2) whether Defendants' review of incoming media (particularly movies rated

5

G, PG, and PG-13) violated Stone's First Amendment rights.

### III.     Applicable Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the case under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" if the evidence could support a jury verdict in the non-moving party's favor.  *Id.*  The Court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must cite to particular facts in the record showing there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 256.

"In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  *Cooksey v. Boyer*, 289 F.3d 513, 515 (8th Cir. 2002).  There is no dispute as to the first element.  As to the second, the constitutional right at issue is the First Amendment right of freedom of speech.  This right "includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read," and "freedom of inquiry and freedom of thought."  *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 938–39 (D. Minn. 2014) (quoting *Griswold v. Connecticut*, 381 U.S. 479,

6

482 (1965)) (cleaned up).

## IV.   Discussion

### A.   Whether Stone Has a First Amendment Right to Watch Movies

Defendants first argue that Stone's First Amendment claim fails "because there is simply no constitutionally protected right in television watching." (Defs.' Mem. Supp. Mot. Summ. J. at 21 (citing *Banks v. Jesson*, No. 11-cv-1706 (MJD/JJK), 2011 WL 6292133, at *2 (D. Minn. Nov. 3, 2011) ("*Banks I*"), *R. & R. adopted*, 2011 WL 6275960 (D. Minn. Dec. 15, 2011)) ("*Banks II*").)  The *Banks I* court considered a First Amendment claim that MSOP contracted for an obsolete television signal format and eliminated access to certain television stations. *Banks I*, 2011 WL 6292133, at *1.  In adopting the report and recommendation issued in *Banks I*, the district court stated that "the right to watch television would certainly be deemed a *de minimis* restriction 'with which the Constitution is not concerned.'" *Banks II*, 2011 WL 6275960, at *1 (quoting *Senty-Haugen*, 462 F.3d at 886).

Stone argues, however, that the right to watch movies and television is protected by the First Amendment. The Supreme Court agrees: "Entertainment . . . is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).  Moreover, a different court in this District recently disagreed with *Banks II*, recognizing that "[t]elevision programming is speech protected by the First Amendment." *Ivey v. Johnston*, No. 18-cv-1429 (PAM/DTS), 2019 WL 3334346, at *6–7 (D. Minn. July 24, 2019) ("*Ivey II*") ("Although

7

there has been little reason outside the prisoner civil rights context for courts to consider a 'right to view television,' the law is established that the content of television programming is, in fact, speech."), *R. & R. adopted*, 2019 WL 3987583 (D. Minn. Aug. 23, 2019).  The *Ivey II* court noted that the Supreme Court has explicitly taken up and stricken down government regulations that impinged the free speech rights of television broadcasters and producers.  *Id.* (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)).

This Court agrees with *Ivey II* and rejects Defendants' argument that there is no First Amendment right to watch television or movies as a matter of law.  This conclusion is also implicit in a ruling the District Court made earlier in this case, when it determined that Stone's allegations were sufficient to state a First Amendment claim.  (Order at 7 [Doc. No. 50].)  If there were no constitutionally protected right to watch movies or television, that aspect of Stone's First Amendment claim could not have survived the motion to dismiss.

### B.   Whether Defendants' Deviations from the 2007 Media Policy and the Terms of the Kruger Settlement Are *Ipso Facto* Unconstitutional

Stone suggests that Defendants' failure to adhere strictly to the 2007 Media Policy and the terms of the *Kruger* settlement *ipso facto* violates his First Amendment rights.[4] The Court disagrees.  Stone has provided no legal support for the proposition that a violation of the *Kruger* settlement agreement violates his First Amendment rights.  In addition, Stone was not a party to that settlement agreement, and he has not alleged a

---

[4] Stone did not bring a breach of contract claim for breach of the settlement agreement.

8

breach of contract claim.  Even if he had alleged such a claim, Kruger is deceased, and nothing in the agreement indicates that the obligations undertaken by MSOP pursuant to that agreement would survive Kruger's death or that court approval would be necessary for future policy revisions.  (Anderson Decl. Ex. 4; *see* Anderson Decl. Ex. 1 at 151.)

The 2007 Media Policy did not establish a ceiling for restrictions on the rights of civilly committed individuals to receive and consume media.  Rather, whether Defendants' application of the 2007 Media Policy violated the First Amendment must be determined by considering the four factors set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987).  *See Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014); (Am. Order at 6–7).  This is consistent with the Amended Order entered by the District Court in this case, which did not indicate that the asserted deviations from the 2007 Media Policy necessarily would be unconstitutional, but stated that "[t]o prevail on the merits, Stone must present evidence and legal argument that demonstrate that Defendants' restrictions on his access to media materials are inconsistent with the *Turner* test."  (Am. Order at 8.)

### C. Whether the Restrictions on Stone's Access to Media Are Inconsistent with the Modified *Turner* Test

In *Turner v. Safley*, the United States Supreme Court determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. 78, 89 (1987).  *Turner* identified four factors relevant to assessing the reasonableness of the regulation: (1) "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "alternative means of exercising the right that

9

remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." 482 U.S. at 89–90 (cleaned up) (citations omitted). The *Turner* analysis applies to Stone's First Amendment claim. (*See* Am. Order at 6–7.)

Civilly committed individuals like Stone "have liberty interests that are 'considerably less than those held by members of free society' but are 'entitled to more considerate treatment and conditions of confinement' than prisoners." *Banks v. Jesson*, 2017 WL 1901408, at *8 (D. Minn. May 8, 2017) ("*Banks III*") (quoting *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)). (*See* Am. Order at 6.) Courts in the District of Minnesota have modified the *Turner* test to account for the unique liberty interests of MSOP clients when assessing whether a restriction on their First Amendment rights is constitutional. *E.g.*, *Karsjens v. Piper*, 336 F. Supp. 3d 974, 992 (D. Minn. 2018); *Banks III*, 2017 WL 1901408, at *8–9; *Ivey v. Mooney*, No. 05-cv-2666 (JRT/FLN), 2008 WL 4527792, at *5, 10 (D. Minn. Sept. 30, 2008) ("*Ivey I*"). The modified factors are: (1) whether the MSOP policy at issue bears a rational relationship to legitimate institutional and therapeutic interests; (2) whether the MSOP client has alternative means of exercising the First Amendment right at issue; (3) whether and to what degree accommodation of the right would impact the institution, resources, staff, and other clients; and (4) whether simple and cost-effective alternatives exist that would meet MSOP's objectives. *See Ivey I*, 2008 WL 4527792, at *5, 10.

### 1. Whether Defendants' Application of the Media Policy Is Rationally Related to Legitimate Institutional and Therapeutic Interests

In assessing the first *Turner* factor, the Court considers whether the institutional and therapeutic objectives underlying Defendants' application of the Media Policy are legitimate and neutral, and whether the application of the Media Policy is rationally related to the objectives. *See Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). "It is the plaintiff's burden to prove that a restriction is not reasonably related to the legitimate interest it purports to further." (Am. Order at 7 (citing *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991)).)

> The institutional and therapeutic objectives of MSOP's media policies are
>
> [t]o provide a therapeutic living environment for [MSOP patients] that enhances their rehabilitation, to provide a safe and secure environment for all persons in MSOP facilities, and to comply with [Minn. Stat. § 246B.04, subd. 2] by restricting patients from possessing obscene, pornographic, or other prohibited materials in a way that is consistent with the constitutional rights of civilly-committed patients.

(*See* 2007 Media Policy at 1.) MSOP's media policies also reflect a concern that some sexually explicit materials "can increase the likelihood of assaultive or harassing behavior among committed patients" or "hinder a patient's rehabilitation." (*See id.*) The objectives described in the 2007 Media Policy comport with the objectives identified by Dr. Elsen. It is well-established that "[t]he rehabilitation of sex offenders and institutional security of MSOP are legitimate government interests under *Turner*." *Banks III*, 2017 WL 1901408, at *8 (citing *Banks v. Jesson*, No. 11-cv-1706 (SRN/JSM), 2016 WL 3566207, at *8 (D. Minn. June 27, 2016); *Banks v. Ludeman*, No. 08-cv-5792

(MJD/JJK), 2010 WL 4822892, at *10 (D. Minn. Oct. 4, 2010), *R. & R. adopted*, 2010 WL 4822888 (D. Minn. Nov. 22, 2010); *Ivey I*, 2008 WL 4527792, at *5).  Stone has not shown otherwise.

As to whether there is a rational relationship between MSOP's institutional and therapeutic interests and the practice of re-reviewing and reclassifying certain media, MSOP posits that an initial review could reasonably result in missed prohibited content or different subjective interpretations of content.  Dr. Elsen averred that clinicians and staff members who review media must exercise their professional judgment in applying subjective policy definitions, and inconsistencies may result from reasonable differences in professional judgment.  (Elsen Decl. ¶ 6.)  Stone admitted in his deposition that an item mistakenly deemed permissible on initial review could later appropriately be deemed prohibited.  (Stone Dep. at 123–24.)  Revisions to the media policies may also be warranted by new or fluctuating institutional concerns, such as security, the therapeutic environment, or scarce resources; or by new sources of media, new ratings systems, or technology.  (Elsen Decl. ¶ 7.)  Differences between the current clinical judgment of MSOP clinicians and the judgment of previous clinicians do not necessarily undercut the rationality of the relationship.  Indeed, *Thornburgh* recognized that inconsistent decisions "are not necessarily signs of arbitrariness or irrationality," but naturally result from the exercise of discretion and "variability within and between institutions over time." *Thornburgh*, 490 U.S. at 417 n.15; *see also Ivey I*, 2008 WL 4527792, at *6.

With particular respect to the re-review and reclassification of movies that were previously deemed as permitted (including movies rated G, PG, and PG-13), Defendants

12

have shown that several of those movies were re-reviewed and reclassified because they were re-released as "Unrated" or "Not Rated" directors' cuts, or as part of an "Unrated" box set. (Elsen Decl. ¶¶ 8–9.) Such reviews of media that had been altered or augmented would be justified by and therefore rationally related to MSOP's institutional and therapeutic objectives. In addition, Stone has not produced any evidence demonstrating that Defendants re-reviewed and reclassified any movie for an improper purpose or in furtherance of an illegitimate interest. Rather, Stone conceded that some now-permitted movies contained questionable material or inappropriate themes. (*E.g.*, Stone Dep. at 139–40.) As to movies rated G, PG, and PG-13, MSOP has now permitted all such movies as a result of the review undertaken as part of this case. (Puffer Decl. ¶ 8; Elsen Decl. ¶ 5 & n.2.)

Notably, nothing in the 2007 Media Policy prohibited re-review and reclassification. (*See* 2007 Media Policy.) And in many instances, the outcome of re-review and reclassification was that many of the movies on Stone's list are now permitted. (Puffer Decl. ¶¶ 6, 8, 11 & n.4.) It is also worth noting that MSOP's general policy is to allow clients to receive and possess movies, reading materials, and other media. (2007 Media Policy at 1; Elsen Decl. Ex. 1 (Media Policy, Feb. 15, 2019) [Doc. No. 151-1].) Re-reviewing and reclassifying movies and other media is rationally related to this institutional interest.

With respect to Stone's claim that Defendants prohibited media (including the movies "Kickass" and "American Girl: Chrissa Stands Strong") that did not "predominantly and prominently" display nudity, that term was only part of the definition

13

of "prohibited materials" contained in Category 8, which in turn was only one of ten categories of "prohibited materials" listed in the 2007 Media Policy. (2007 Media Policy at 2.) In positing that MSOP cannot prohibit media unless it contains more than 50% nudity or sexual content, Stone ignores the remainder of the definition of Category 8, not to mention the other nine categories.

Consequently, Stone has not shown that Defendants' interpretation and application of the term "prohibited materials" is not rationally related to MSOP's institutional and therapeutic interests, nor has he presented any evidence that Defendants prohibited any media for any reason other than to further a legitimate institutional or therapeutic interest. On the contrary, Defendants' application of the Media Policy, as challenged by Stone, is rationally related to MSOP's therapeutic and institutional interests.

### 2. Whether Stone Has Alternative Means of Exercising the First Amendment Right at Issue

Stone has many alternative ways to exercise his First Amendment right to watch movies and consume other media. There are more than 8,000 movies on the current MSOP permitted list. (Stone Dep. 155–56.) Stone can order as many books or movies as he can store in his room, and he has more than 200 movies in his personal collection. (Stone Dep. 29–30, 87.) Stone can watch several television channels in his room or in MSOP common areas. (Stone Dep. at 23–25; Berg Decl. ¶ 8 [Doc. No. 150].) Stone has free access to thousands of books and DVDs through MSOP's internal library. (Stone Dep. at 84; Bennett Decl. ¶¶ 3–4 [Doc. No. 149].) Stone may also appeal specific media determinations with which he disagrees. (Elsen Decl. Ex. 1 at 6.)

To the extent Stone argues he has no alternative means to access sexual content, MSOP's media policies do not categorically ban all media that contain nudity or sexual content. (*See* Elsen Decl. Ex. 1.) In addition, when reviewing media in connection with this case, MSOP officials permitted several movies that depicted sexual activity and that showed exposed breasts, buttocks, and genitalia. (*E.g.*, Puffer Decl. Ex. 3 at MSOP0023795, MSOP0023797–99.)

### 3. Whether and to What Degree Accommodating the Right Would Impact the Institution, Resources, Staff, and Other Clients

Stone has proposed that Defendants can serve any legitimate purposes of MSOP's sexual content restrictions and still accommodate his First Amendment rights by reviewing media on a case-by-case basis, and/or by allowing all media that contains 49% or less sexual content regardless of whether it poses therapeutic concerns. Defendants submit that such accommodations would adversely affect the MSOP program and clients because it would result in clients selling, trading, or stealing media with sexual content, resulting into the introduction of such media into the general population. (Defs.' Mem. Supp. Mot. Summ. J. at 37.) Media with sexual content is often traded among clients, and clients even steal such media. (Stone Dep. at 31, 150; *see* Elsen Decl. ¶ 3.) Introducing such media into the general population could result in greater client access to triggering materials and interfere with MSOP's ability to manage the overall therapeutic environment. (Stone Dep. at 31, 150; *see* Elsen Decl. ¶ 3.)

Defendants have shown that accommodating the right as Stone would like would have some impact on the institution, resources, staff, and other clients. Stone has not

15

identified facts showing otherwise.

### 4. Whether Simple and Cost-effective Alternatives Exist that Would Meet MSOP's Objectives

Stone has not proposed simple or cost-effective alternatives that would meet MSOP's objectives. Case-by-case review of box sets and "Not Rated" and "Unrated" media is neither simple nor cost-effective, as evidenced by the onerous number of review requests of such media under previous versions of the policy. (Elsen Decl. ¶¶ 8–9 & n.6.) Individual review requests created enough work to occupy approximately five full-time staff members. (Elsen Decl. ¶ 8.) Such requests also consumed the time of MRT members, four of whom do work integral to treating MSOP clients and two of whom are highly-compensated supervisors. (*Id.*) Before the most recent iteration of the MSOP media policy was enacted in February 2019, MSOP clients were ordering a large volume of "Unrated" and "Not Rated" content, which often has a substantial amount of sexually explicit material. (Elsen Decl. ¶ 9.) Review of "Unrated" or "Not Rated" box sets or seasons of television shows is unduly burdensome because a box set or season usually contains many disks. (Elsen Decl. ¶ 9 n.6.) Notably, however, the rated versions of several such movies or box sets have been permitted. (Puffer Decl. ¶¶ 6, 8, 11 n.4.)

Defendants have demonstrated that simple and cost-effective alternatives that would meet MSOP's objectives do not exist. Stone has not identified facts showing otherwise.

## V. Recommendation

Stone has not satisfied his burden to show that Defendants' application of the

16

MSOP's media policies is not reasonably related to legitimate therapeutic and institutional interests. Accordingly, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Dennis L. Benson, Lucinda E. Jesson, Robert D. Liggett, Thomas Lundquist, Kevin Moser, and David Prescott's Motion for Summary Judgment [Doc. No. 145] be **GRANTED**;

2. Stone's remaining First Amendment claim be **DISMISSED WITH PREJUDICE**; and

3. **JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: December 3, 2019

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).